In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 04-3829, 04-3900

MICHAEL P. GAFFNEY, THOMAS BELL,
EDWARD ANDERSON, et al.,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

RIVERBOAT SERVICES OF INDIANA,
INCORPORATED, RIVERBOAT SERVICES,
INCORPORATED, ROBERT HEITMEIER, et al.,

*Defendants-Appellants,*
*Cross-Appellees,*

*v.*

SHOWBOAT MARINA CASINO
PARTNERSHIP, SHOWBOAT,
INCORPORATED, SHOWBOAT
INDIANA, INCORPORATED, et al.,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 98 C 10—**Andrew P. Rodovich**, *Magistrate Judge.*

———————

ARGUED SEPTEMBER 19, 2005—DECIDED JUNE 16, 2006

———————

Before RIPPLE, WOOD and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge.*   The plaintiffs, who are licensed merchant marine officers,[1] brought this whistleblower action under 46 U.S.C. § 2114 against Showboat Marina Casino Partnership, Showboat, Inc., Showboat Indiana, Inc., Showboat Mardi Gras Casino and *M/V Showboat* (collectively "Showboat"), Riverboat Services, Inc. and Riverboat Services of Indiana, Inc. (collectively "Riverboat"), and Robert Heitmeier and Thomas Gourguechon in their individual capacities. *See* Pub.L. No. 98-557, § 13(a), 98 Stat. 2863 (1984) (current version at 46 U.S.C. § 2114 (2002)).[2] The plaintiffs claim that they were discharged in retaliation for engaging in statutorily protected correspondence with the United States Coast Guard ("Coast Guard") about a change in hiring guidelines on the vessel on which they were employed, the *M/V Showboat*. After a bench trial on the plaintiffs' claims against Riverboat and the individual defendants, the United States District Court for the Northern District of Indiana entered judgment in favor of all but two plaintiffs and awarded back pay, expenses and punitive damages. Those defendants now appeal, contending that the district court erred in holding that the plaintiffs established the requisite causation between their correspondence with the Coast Guard and their subsequent terminations.

---

[1]   The individual plaintiffs are merchant marine officers Michael Gaffney, Thomas Bell, Edward Anderson, Robert Beardon, Thomas Trundy, Thomas Goodridge, Dean Horton, Adam Doncet, Robert Palmer and Neil Reilly.

[2]   Since the events in this case, 46 U.S.C. § 2114 has been amended. Neither party argues that these amendments—which were enacted after this litigation began—apply to the present case. *See* footnote 19, *infra*.

These defendants also submit that the plaintiffs did not prove that they are entitled to whistleblower protection under § 2114: according to the defendants, the plaintiffs did not act in "good faith," did not make a "report[]" to the Coast Guard, and did not have a reasonable belief that a violation of safety laws and regulations had occurred at the time of the correspondence. *Id.* Further, the individual defendants contend that they are not subject to § 2114 liability because they do not qualify as "individual[s] in charge of a vessel." *Id.* The two plaintiffs who did not obtain relief[3] cross-appeal the district court's ruling denying them relief. All ten plaintiffs appeal the denial of attorneys' fees. Finally, Riverboat appeals the district court's judgment granting partial summary judgment to Showboat. Riverboat contends that Showboat was required to obtain insurance for the plaintiffs' claims and, thus, it is entitled to indemnification from Showboat. For the reasons set forth in the following opinion, we affirm in part and reverse in part the judgment of the district court.

# I

# BACKGROUND

## A. Facts

This appeal involves the claims of ten[4] licensed merchant marine officers, formerly employed as captains, chief engineers, assistant engineers or deck officers on the *M/V Showboat*, a large gaming vessel that carried passengers on

---

[3]  These two plaintiffs are Mr. Horton and Mr. Doncet.

[4]  The eleventh plaintiff, Robert B. "Barry" Wood, was dismissed with prejudice by the district court on July 16, 1999.

excursions on Lake Michigan.[5] They allege that they were terminated in retaliation for reporting the violation of safety regulations to the United States Coast Guard and that their terminations violate 46 U.S.C. § 2114(a).[6] *See* § 13(a), 98 Stat. at 2863. The plaintiffs filed suit in 1998 against Showboat, the registered owner of the *M/V Showboat*, and Riverboat, the operator and manager of the vessel. The plaintiffs also named two individual defendants: Robert Heitmeier, the President, member of the Board of Directors and sole shareholder of both Riverboat Services, Inc. and Riverboat Services of Indiana, Inc.; and Thomas Gourguechon, who during the events in this case was both the Director of

---

[5] Specifically, during the events in this case, Mr. Gaffney and Mr. Reilly were Chief Engineers; Mr. Bell was a Captain; Mr. Anderson, Mr. Beardon and Mr. Horton were Deck Officers; and Mr. Trundy, Mr. Goodridge, Mr. Doncet and Mr. Palmer were Assistant Engineers. All held unlimited licenses for their respective positions.

[6] The plaintiffs' second amended complaint contained four counts: Count I alleged that the defendants violated 46 U.S.C. § 2114. Count II alleged that the defendants violated general maritime law. Count III alleged an in rem action against the *M/V Showboat*. Count IV alleged that the defendants violated Indiana state law by wrongfully terminating the plaintiffs. Count I is the only count at issue on appeal; the other counts previously were dismissed by the district court. *See* R.192 at 19 n.4 (holding that the plaintiffs' state law claims are preempted by federal law); *id.* at 18 (dismissing the plaintiffs' claim based on maritime law as irrelevant and cumulative, given that maritime law recognizes the tort of wrongful discharge only when a seaman is terminated in contravention of an "important public policy," which, in substance, is the same right recognized by federal statute). These findings have not been challenged on appeal.

Marine Operations for Riverboat and the Director of Project Management for Showboat.

### 1. The *M/V Showboat*

The *M/V Showboat*, the ship on which the plaintiffs were employed, is one of the largest casino vessels currently operating in the United States; it weighs 2,803 gross tons, is 332-feet long and can carry up to 4,250 passengers and crew at a time. During the period at issue in this litigation, the *M/V Showboat* operated on a daily basis gambling excursions on Lake Michigan that departed from, and returned to, East Chicago, Indiana.

The vessel's operation is governed by a Marine Management Services Agreement (the "Agreement") between Riverboat and Showboat. *See* R.37, Ex.A. This Agreement gives Riverboat the "exclusive right and obligation to manage and operate the marine aspects of the [*M/V Showboat*]." *Id.* § 3.01. Specifically, Riverboat is responsible for ensuring that the vessel's operation complies with applicable state and federal laws, including United States Coast Guard regulations, *see id.*; employing and training the vessel's crew in a manner consistent with generally accepted standards of the riverboat gaming industry, *see id.* §§ 3.01, 3.02(I); monitoring the qualifications of the vessel's staff, as well as assuring that the maritime staff is properly licensed, *see id.* § 3.02(iv); and the hiring, firing, promotion and supervision of all executive and service employees, *see id.* § 3.04.1. In turn, the Agreement obligates Showboat to obtain insurance and to name Riverboat as the insured party. Section 5.01.1 specifies that Showboat should obtain insurance covering all "acts, omissions and injuries to persons or property" caused by Riverboat or its agents, in the amount of not less than

five million dollars. *See id.* § 5.01.1. Section 5.01.01.1 then lists five types of insurance coverage required: worker's compensation insurance; comprehensive general liability insurance for accidents and property damage; full form protection and liability insurance on all vessels and floating equipment; hull and machinery insurance; and collision liability insurance for damage to vessels and floating objects. In addition, the Agreement mandates that Showboat obtain coverage for liabilities arising under the Jones Act. *See id.*

The operation of the *M/V Showboat* also is required to abide by federal statutes and regulations. In pertinent part, applicable Coast Guard regulations provide that a limited engineer license permits a chief or assistant engineer to "serve within any horsepower limitations on vessels of any gross tons on inland waters," but not on vessels of "more than 1600 gross tons in . . . Great Lakes service." 46 C.F.R. § 10.501(b); *see also id.* § 15.915(b)-(d). At 2,803 gross tons, the *M/V Showboat* falls into the latter category. Fearing that the Coast Guard under these regulations would require the *M/V Showboat* to hire exclusively engineers with unlimited licenses, on August 27, 1996, Mr. Heitmeier wrote to Lieutenant Commander Rich Brundrett at the Regional Examination Center of the United States Coast Guard in Toledo, Ohio. *See* R.81, Ex.6. He requested that the Coast Guard amend *M/V Showboat*'s Certificate of Inspection ("COI")[7] to permit the employment of engineers with

---

[7] A COI is a document issued by the Coast Guard, which certifies that the vessel complies with applicable regulations. It also delineates other necessary conditions for safe operation of the vessel, including the requisite number of officers and their

(continued...)

limited engineer licenses. In support of his request, Mr. Heitmeier submitted that the *M/V Showboat* was similar in terms of installed machinery, route and length of voyage to vessels operated by Riverboat on rivers and inland waters; in short, he contended that, because of its limited use as a sailing vessel, the *M/V Showboat* should not be characterized as a vessel in Great Lakes service and should be permitted to employ engineers with limited licenses. Riverboat's request was granted. The Coast Guard issued the *M/V Showboat*'s first COI in April 1997; it provided that "[a]n individual holding a license as chief engineer limited or assistant engineer limited may serve as chief engineer or assistant engineer respectively." R.34, Ex.1. Shortly thereafter, the COI was posted and the vessel was opened to the public.

### 2. The Communications with the Coast Guard

Shortly after the amended COI was posted, the plaintiffs initiated contact with the Coast Guard. On August 11, 1997, a group of twelve officers, including six plaintiffs—Messrs. Gaffney, Goodridge, Palmer, Reilly, Horton and Doncet— sent a letter to the Commandant of the Coast Guard, Admiral Robert E. Kramek. Mr. Gaffney authored this letter and obtained the signatures of the other officers. In the letter, the officers expressed concern that "the relaxation of licensing requirements for the engineers on the M/V Showboat . . . substantially reduces passenger safety by not

---

(...continued)

qualifications. *See* 46 U.S.C. § 3307 (requiring "inspection for certification before [a vessel is] put into service"); *id.* § 3309 (setting forth the requisite procedures for issuing a COI).

requiring experienced personnel to crew the vessel." R.34, Ex.2. The plaintiffs concluded the letter by requesting information from the Coast Guard about the amended COI. Mr. Gaffney testified that this letter was sent to obtain clarification about licensing requirements because the COI did not specify "what [the change] actually meant." Tr.I at 113. The Coast Guard responded with two separate letters that, according to Mr. Gaffney, did not answer the plaintiffs' questions about the nature of the licensing relaxation but did provide necessary information about proper appeals procedures. Gaffney Dep., R.81, Ex.7 at 42.

A second letter was sent to the Coast Guard on October 3, 1997, this time signed only by Mr. Gaffney and addressed to Lieutenant Neil Shoemaker. R.34, Ex.3. In this letter, Mr. Gaffney expressed concern that two employees[8] had been fired because of their correspondence with the Coast Guard about the relaxation of licensing requirements. In addition, Mr. Gaffney reiterated his concern that the licensing changes risked "a serious disaster," given the "shear [sic] number of people onboard" and the relationship between licensing and experience. *Id.* Mr. Gaffney also inquired about the "specific qualifications for limited engineers," including the number of years' experience required to obtain the license in question. *Id.*

On October 5, 1997, Mr. Gaffney sent follow-up correspondence to Lieutenant Shoemaker. *See* R.34, Ex.4. He reported that one of the assistant engineers with an unlimited license recently had been approved to sit for his limited license for a chief engineer position. Mr. Gaffney expressed concern that allowing "a person with so limited experience"

---

[8] These two individuals are not parties to the present litigation, but were signatories to the August 11th letter.

to "sign[] on as Chief Engineer of this vessel is the reason why myself and my fellow officers wrote the initial letter to [Coast Guard] Commandant." *Id.*

The last letter to the Coast Guard, which is the focus of this appeal, is dated October 10, 1997. All of the plaintiffs except Mr. Horton and Mr. Doncet signed this letter, as did eight other individuals not parties to this suit. *See* R.34, Ex.5.[9] In this letter, the plaintiffs requested a thirty-day extension of time to file an appeal challenging the relaxation of licensing requirements granted to the *M/V Showboat*. "Our request," the plaintiffs explained, "is based on the following reasons":

> The lowering of licensing standards for engineering officers aboard the M/V Showboat occurred April 11th, 1997 . . . . It was not publicized until mid June, 1997 . . . . After some preliminary research into the lowered licensing requirements, we wrote the USCG Commandant in an effort to understand the exact reason for relaxing these standards. . . . As a group directly effected [sic] by this decision, we feel that we should have been extended the opportunity to have our thoughts, opinions and concerns heard . . . .
>
> It is our contention that the change in licensing requirement for the engineers on the M/V Showboat Mardi Gras from Unlimited to Limited has served to potentially and substantially compromise safety standards aboard the vessel.

---

[9] Copies of these letters, as well as individual pleas for assistance in resolving labor disputes with the owners and operators of the *M/V Showboat*, also were sent to various members of Congress. *See* R.64, Ex.Q.

The safety requirements set by the United States Coast Guard are minimum requirements for safe operation of vessels, and the operative word here is minimum. Typically, vessel owners and managers conform only to the bare minimum requirements while viewing additional safety items as an inconvenience or extra cost. The request from Riverboat Services Incorporated (RSI) to lower the license requirement for the engineers is a prime example of this tenet as evidenced by their letter of request. . . . Approval of their request has effectively lowered required experience for engineers to a substandard level.

*Id.* at 1. The letter also described the training discrepancies between an engineer with a limited license and an engineer with an unlimited license. Further, it set forth the reasons why extensive experience on board a large vessel is an essential qualification of engineers navigating the *M/V Showboat*—the difficulty of maneuvering in shallow waters and around obstacles, the passenger capacity of the vessel and the dangers of wind gusting. Finally, the letter rebutted the claim that engineers with limited licenses generally have sufficient experience to serve on inland vessels such as the *M/V Showboat*.

In a letter dated October 31, 1997, Captain M. W. Brown, the Officer in Charge of Marine Inspection, denied the plaintiffs' appeal. *See* R.34, Ex.8. Captain Brown acknowledged receipt of the October 10th letter, which—although phrased as a request for an extension of time—he classified as an "appeal[]" of the "decision to permit the use of engineers with 'limited' licenses aboard Great Lakes vessels

not more than 4,000 gross tons."[10] *Id.* After researching the issue raised in the "appeal," he disagreed that

> the use of limited licensed engineers threatens the safety of M/V SHOWBOAT.
>
> While the service requirements between unlimited and limited engineers are different, limited engineers are still required to have appropriate and relevant experience. The regulations currently permit the use of limited engineers for vessels of any gross tons on inland waters. The SHOWBOAT, due to its extremely short "close in" route, combined with its fairweather operating criteria, is analogous to operation on inland waters. . . .
>
> Accordingly, your appeal is denied, and the SHOW-BOAT's existing Certificate of Inspection remains valid.

*Id.* The signatories to the October 10th letter appealed Captain Brown's decision to the Commander of the Ninth Coast Guard District. *See* R.34, Ex.9. In the appeal, the plaintiffs expressed frustration with Captain Brown's failure to "differentiate between passenger vessels and cargo vessels." *Id.* "We feel," they wrote, "that the highest standards should be required, not wavered, on high capacity passenger vessels such as the M/V Showboat, which carries 4,250 passengers and crew." *Id.* This letter also expressed concern that the relaxation of licensing requirements was a

---

[10] Captain Brown misquoted the applicable regulation. 46 C.F.R. § 15.915(b)-(d) prohibits vessels of more than 1,600 gross tons, *not* 4,000 gross tons, in Great Lakes service from employing either chief or assistant engineers with limited licenses. The provision permitting vessels of not more than 4,000 horsepower to employ engineers with limited licenses applies only to designated duty engineers. *See* 46 C.F.R. § 15.915(a)(1).

growing trend. In that regard, it noted that the Coast Guard recently had issued an amended COI, endorsing the employment of engineers with limited engineering licenses for a vessel similar in size and function to the *M/V Showboat.*

Captain G. S. Cope, acting at the direction of the Ninth District Commander, granted the plaintiffs' appeal on December 19, 1997. *See* R.34, Ex.10. Captain Cope wrote:

> In reviewing the record of this appeal, I found that the endorsement of the M/V SHOWBOAT's certification of inspection to allow limited engineers, did not comply with 46 CFR 15.915. That regulation authorizes individuals licensed as Chief Engineer (limited) or Assistant Engineer (limited) to serve as Chief or Assistant Engineer on vessels up to 1,600 Gross Tons upon the Great Lakes. Since the M/V SHOWBOAT is greater than 1,600 Gross Tons, an individual holding only a "limited" engineer license could not legally serve as the vessel's Chief or Assistant Engineer.

*Id.* The Captain directed the Officer in Charge of Marine Inspection at the Coast Guard to remove the endorsement allowing for employment of limited license engineers from the *M/V Showboat*'s COI. An amended COI was sent to Riverboat on December 31, 1997. It was posted on the vessel on January 5, 1998.

It is undisputed that, by January 5, Mr. Gourguechon had become aware of the plaintiffs' correspondence with the Coast Guard. Mr. Gourguechon testified that, in late October, he found the plaintiffs' October 10th letter to the Coast Guard, which he characterized as merely a "job security letter," in the pilot house. Tr.IV at 47-48. Further, at the end of 1997, Mr. Gaffney had approached Mr. Gourguechon with his concerns about the relaxation of licensing requirements, as well as discussed with him

developments in the plaintiffs' October 10th "appeal."[11] Tr.I at 154-57. There is no evidence, however, that—before the complaint was filed on January 13, 1998, to which was attached the relevant Coast Guard correspondence—Mr. Gourguechon had read any of the previous letters or that Mr. Heitmeier had read any of the four letters at all. *See* Gourguechon Test., Tr.IV at 47; Heitmeier Dep., R.81, Ex.2 at 59-60.

### 3. The Plaintiffs' Terminations

On January 6, 1998, Mr. Gaffney received a letter from Mr. Gourguechon, notifying him that his employment as Chief Engineer on the *M/V Showboat* had been terminated, effective immediately. The letter identified the reasons for termination as:

> Unauthorized communication and correspondence with regulatory bodies having jurisdiction over the operation of the vessel. Unauthorized correspondence and the regulators [sic] response has had a material adverse effect on the company's ability to efficiently run it's [sic] business.

---

[11] The parties dispute the scope and substance of these conversations. For example, Mr. Gaffney testified that, on January 5, before the amended COI was posted, he informed Mr. Gourguechon that the plaintiffs' appeal to the Coast Guard concerning licensing requirements had been granted. According to Mr. Gaffney, Mr. Gourguechon told him that Mr. Heitmeier and Mr. Wallace, the President and CEO of Showboat's East Chicago operation, "were upset" and that Mr. Gaffney would "tak[e] the heat for [the appeal]." Tr.I at 181. Mr. Gourguechon denies having made these statements, although he admits knowing of the plaintiffs' October 10th letter to the Coast Guard prior to the plaintiffs' terminations. *See* Tr.IV at 47-48.

R.81, Ex.15. Mr. Gaffney was offered no other explanation, either in writing or verbally, for his termination. According to Mr. Gaffney, upon receiving this letter, he told Mr. Gourguechon, "You can't fire me for that." *Id.*, Ex.7 at 84.

The other nine plaintiffs were fired over the course of the next two-and-a-half weeks.[12] Unlike Mr. Gaffney's termination letter, the letters received by these individuals did not contain reference to Coast Guard correspondence but, instead, gave no reason for their discharges. When confronted by these plaintiffs, Mr. Gourguechon denied that their discharges were in any way related to the Coast Guard correspondence.[13]

---

[12] Messrs. Bell and Beardon both received their termination letters from Mr. Gourguechon on January 6, 1998. *See* R.81, Ex.16-17. Mr. Anderson received his termination letter on January 7, 1998. *See id.,* Ex.18. Mr. Trundy received his termination letter on January 8, 1998. *See id.,* Ex.19. Mr. Goodridge received his termination letter on January 14, *see id.,* Ex.20, and Mr. Horton received his on January 15, *see id.,* Ex.21. Mr. Reilly was notified of his discharge on or about January 21, 1998, although he did not receive a written termination notice. On January 22, Mr. Doncet was terminated. *See id.,* Ex.22. Mr. Palmer was discharged the next day. *See id.,* Ex.23.

During this time, approximately forty other individuals, who had not signed any of the letters to the Coast Guard, also had their employment terminated. Additionally, the jobs of a number of other signatories to the October 10th appeal, including Eric James, Steve Habermehl, Duane Hunt and Derek Melanson, were not affected.

[13] For example, Mr. Doncet stated that, after he was told of his termination, he asked Mr. Gourguechon whether it was related to the plaintiffs' correspondence with the Coast Guard.
(continued...)

Mr. Gourguechon testified that, although he drafted and hand-delivered all but one of the plaintiffs' termination notices, he was acting at the direction of Mr. Heitmeier. *See* Tr.IV at 76-78. Specifically, according to both Mr. Gourguechon and Mr. Heitmeier, in late 1997, Mr. Gourguechon approached Mr. Heitmeier about problems he was having with the plaintiffs' employment on the *M/V Showboat*. *Id.* at 36-38. This conversation focused on the plaintiffs' potential connections to the Marine Engineers' Beneficial Association ("MEBA"), the union responsible for picketing near the vessel that was sometimes violent and often disruptive. They also discussed the plaintiffs' involvement in defective rewiring of the *M/V Showboat*. A number of the plaintiffs had been assigned to assist in repositioning the gaming machines on the vessel; improper wiring later caused a circuit breaker to blow and was responsible for expensive damage to the vessel. Various Riverboat executives, including Mr. Gourguechon and Mr. Heitmeier, believed that the plaintiffs—in cooperation with MEBA—had sabotaged the ship, and they cite this incident as the cause of the plaintiffs' terminations. *See* Gourguechon Test., Tr.IV at 38-43; Heitmeier Dep., R.81, Ex.2 at 61-63.

According to the defense, after this conversation, Mr. Heitmeier approached Mr. Wallace, the President and CEO of Showboat's East Chicago, Indiana, operations. At this meeting, Mr. Heitmeier informed Mr. Wallace of the plaintiffs' connections to MEBA and the suspected acts of

---

(...continued)
Mr. Gourguechon "did not say anything in response." R.81, Ex.25 at 2. Mr. Trundy testified that Mr. Reilly asked Mr. Gourguechon about his termination in Mr. Trundy's presence, and Mr. Gourguechon responded that "[t]here [was] no reason" for it. Tr.III at 112.

sabotage. Mr. Wallace directed Mr. Heitmeier to terminate the individuals involved. As Mr. Wallace later explained, "[i]f they had anything to do with the union, I wasn't . . . interested in the continued aggravation they were causing." R.81, Ex.3 at 25, 28; *see also* Heitmeier Dep., *id.*, Ex.2 at 62-63. Mr. Heitmeier in turn conveyed these instructions to Mr. Gourguechon, who drafted the termination notices.

## B. Procedural History

On January 13, 1998, Messrs. Gaffney, Bell, Beardon, Anderson and Trundy filed suit against Riverboat, Showboat, and Mr. Heitmeier and Mr. Gourguechon in their individual capacities.[14] The First Amended Complaint added Messrs. Goodridge, Horton and Doncet as plaintiffs; the Second Amended Complaint added Messrs. Palmer and Reilly. The plaintiffs asserted that their terminations violated 46 U.S.C. § 2114, the anti-retaliation statute protecting seamen who report the violation of safety regulations on board a vessel to the Coast Guard. They sought reinstatement with back pay, injunctive relief, compensatory and punitive damages and attorneys' fees.

---

[14] Plaintiffs Bell, Beardon, Anderson and Trundy also filed a complaint with the National Labor Relations Board ("NLRB"), alleging a violation of § 8(a)(1) of the National Labor Relations Act ("NRLA"). The matter was heard by an Administrative Law Judge ("ALJ") on July 26 and 27, 1999. The ALJ found that the defendants had violated the NLRA and ordered back pay and reinstatement. The district court held that these proceedings barred these plaintiffs from pursuing their state law claims in federal court. *See* R.95 at 16 (dismissing Bell, Beardon, Anderson and Trundy's state law claims as "preempted by the September 23, 1999 NLRB adjudication").

### 1. The Counterclaim and Cross-Claim

On December 10, 1998, Showboat filed a cross-claim against the Riverboat defendants, contending that Riverboat was solely responsible for all employment matters on the *M/V Showboat*, including termination of the plaintiffs; therefore, Showboat claimed, Riverboat was required to indemnify Showboat for all litigation expenses and for the cost of settlement. *See* R.37. In turn, on March 1, 1999, Riverboat filed a counterclaim against Showboat, claiming that Showboat was obligated under the terms of their Agreement to insure or indemnify Riverboat for all "acts and omissions" causing injury, including violation of § 2114. *See* R.46. On June 30, 2000, Showboat moved for summary judgment against Riverboat on its cross-claim, as well as on Riverboat's counterclaim. *See* R.68. The district court granted this motion in part and denied it in part. *See* R.99. First, the court found that the Agreement did not obligate Showboat to insure against retaliatory discharge claims. *See id*. at 5-9. Specifically, it held that, although § 5.01.1 of the Agreement speaks broadly of insurance policies for Riverboat's "acts, omissions, and injuries," *see* R.37, Ex.A, this provision is modified by § 5.01.01, which specifies, and thereby limits, the requisite scope of coverage. Under § 5.01.01, Showboat was obligated to obtain insurance policies that included within their scope the following: worker's compensation insurance, comprehensive general liability insurance, full form protection and indemnity insurance on all vessels and floating equipment, hull and machinery insurance and collision liability insurance for damage to vessels. *See* R.99 at 9. However, it was not required to obtain "an *additional*, general 'acts and omissions' policy which would have covered intentional acts," such as violation of § 2114. *See id.* (emphasis in original). Riverboat now appeals this decision.

The district court, however, denied Showboat's motion for summary judgment on its cross-claim against Riverboat. The court held that, although the Agreement provides that

> Riverboat is solely responsible—as between Riverboat and Showboat—for discharging plaintiffs, this does not absolve Showboat as "owner . . . of a vessel" of liability to plaintiffs since plaintiffs have also brought a direct § 2114 claim against Showboat for discrimination, and, construing the evidence in the light most favorable to the non-moving plaintiffs, a directive that plaintiffs be fired could certainly arguably constitute a "manner" of discrimination. Because the court is not prepared on the briefs before it to enter judgment in favor of Showboat on plaintiffs' discrimination claim, Showboat's motion for summary judgment against plaintiffs is DENIED.

*Id.* at 9-10 (internal citation omitted) (alteration in original).

Showboat has not appealed the district court's denial of summary judgment. Because the parties never sought resolution of the factual issues implicating the disposition of this cross-claim, Showboat's cross-claim against Riverboat is still pending in the district court.

### 2.  The Plaintiffs' Claims Against Showboat

In August 2001, the plaintiffs reached a settlement with Showboat in the form of a loan receipt agreement.[15] Also

---

[15] In pertinent part, the loan receipt agreement provides that Showboat shall advance to the plaintiffs an undisclosed sum of money; the plaintiffs are obligated to repay this sum, with interest, from the proceeds of any amount received from a

(continued...)

in August, the district court, pursuant to Federal Rule of Civil Procedure 21, severed the plaintiffs' claims against Showboat from the plaintiffs' claims against the other defendants, in part because Showboat had not consented to the jurisdiction of the magistrate judge. *See* R.168. On December 13, 2004, the district court dismissed the plaintiffs' claims against Showboat with prejudice. *See* R.209.

### 3. The Plaintiffs' Claims against Riverboat

After the district court denied Riverboat's motion for summary judgment, the plaintiffs' claims against Riverboat were scheduled for a bench trial before a magistrate judge. The trial was held from August 19 to August 22, 2002. All ten plaintiffs testified, as did Mr. Gourguechon. In addition, the defense offered into evidence the deposition testimony of Mr. Heitmeier.

At trial, the defense argued that the plaintiffs were terminated not because of their correspondence with the Coast Guard, but because of their involvement in disruptive union activity on and near the vessel. According to the defense, although Mr. Gourguechon knew of the plaintiffs' letters to the Coast Guard prior to the initiation of the lawsuit, he viewed the letters as a benign job preservation effort, which did not threaten Riverboat's operations.

In addition, the defense submitted that the plaintiffs were not entitled to § 2114's whistleblower protections. It viewed this statutory protection as narrowly tailored to protect

---

[15] (...continued)
settlement with or final judgment against the other defendants in the case.

seamen who make a formal complaint to the Coast Guard by reporting an actual violation of safety regulations caused by the captain or master of the vessel and who believe that this violation poses a significant safety hazard. According to the defense, the plaintiffs did not fulfill these requirements because: (a) they subjectively did not believe that the employment of limited license engineers would impair the safety of the vessel; (b) the plaintiffs' belief that Riverboat had committed a violation of safety regulations was unreasonable, given that Riverboat had yet to employ an engineer with a limited license; (c) the plaintiffs did not file a formal complaint with the Coast Guard; and (d) they were not discriminated against by a "master[] or individual in charge of a vessel." § 13(a), 98 Stat. at 2863.

At the conclusion of the bench trial, each party submitted post-trial briefs. Subsequently, the district court entered an order finding for all but two of the plaintiffs, Mr. Doncet and Mr. Horton. The district court first concluded that eight of the ten plaintiffs, those who had signed the October 10th letter, had established a causal link between their correspondence with the Coast Guard and their subsequent terminations. Although the court recognized that Riverboat also was concerned with disruptive union activity on and near the vessel, it held that the activity protected by § 2114 need not be the "sole cause of the discharge." R.191 at 24, 27. Instead, relying on both Jones Act and civil rights case law, *see*, *e.g., Smith v. Atlas Off-Shore Boat Serv., Inc.*, 653 F.2d 1057, 1063 (5th Cir. 1981), the court held that the seamen only must "affirmatively establish that the employer's decision was motivated in substantial part" by the plaintiffs' protected activities. R.191 at 24 (internal quotation marks omitted).

The district court concluded that Riverboat's decision to terminate the plaintiffs was motivated in substantial part by their correspondence with the Coast Guard. In support, the court cited four pieces of evidence: (1) that Mr. Gaffney's termination letter explicitly cited the communication with the Coast Guard as the cause of termination; (2) that the other plaintiffs were "fired in rapid succession and only days after the Coast Guard informed [Riverboat] that it was rescinding the COI limited endorsement"; (3) that the defendants' justifications for the terminations changed "at each stage of the proceedings"; and (4) that disruptive union activity or sabotage was not cited when the terminations occurred or at the NLRB proceedings as a reason for the plaintiffs' discharges. *Id.* at 27-29. In light of these findings, the district court concluded that there existed both direct and circumstantial evidence that the plaintiffs were terminated because of their report to the Coast Guard.

The court also concluded that the eight prevailing plaintiffs had fulfilled the legal requirements of § 2114. The October 10th letter was a "report," rather than merely a request for information, and thus was entitled to protection under § 2114. *Id.* at 20. The plaintiffs acted in "good faith" in reporting the violation, which the district court defined as the absence of "an improper purpose." *Id*. at 22. This requirement was satisfied because each plaintiff "generally believed that the lowering of the requirements created a safety hazard onboard the vessel." *Id.* at 2. Mr. Heitmeier and Mr. Gourguechon were both "individuals in charge of a vessel," defined by the district court as a person with responsibility for "hir[ing] and fir[ing] personnel" and for "day-to-day operations of the vessel." *Id.* at 29. Consequently, both defendants could be held liable in their individual capacities for the illegal discharges. And, although Riverboat had not yet hired an engineer with a

limited license at the time that the plaintiffs' letters were written, and therefore had not yet committed a violation of safety laws or regulations, the "statute does not specifically state that the alleged safety violation must have been committed by the vessel owner rather than a third party." *Id*. at 16. In fact, according to the court, "it would be unreasonable to hold that the reporting of a perceived violation committed by a third party, like the Coast Guard itself, does not fall within the ambit of the statute," given that its purpose is "to promote safety and to remedy unsafe conditions on a vessel." *Id*. Thus, the Coast Guard, in authorizing the employment of engineers with limited licenses in violation of 46 C.F.R. §§ 10.501 and 15.915, committed a regulatory violation cognizable under § 2114. *Id.* at 22-23.

Nevertheless, because Mr. Horton and Mr. Doncet were not signatories to the October 10th letter and because there was no evidence that the August letter they signed was a "report," the court determined that they had not met their burden of proving causation between activity protected by § 2114 and their subsequent terminations. *Id.* at 21.

The district court awarded the eight prevailing plaintiffs back pay, expenses and punitive damages.[16] It concluded that all three remedies were authorized both by § 2114, which makes available any "appropriate relief," *id.* at 33-34,

---

[16] Specifically, the district court awarded damages in the following amounts: Mr. Gaffney: $35,632; Mr. Goodridge: $126,505; Mr. Anderson: $77,060; Mr. Bell: $55,564; Mr. Beardon: $122,046; Mr. Palmer: $127,767; Mr. Trundy: $113,564; and Mr. Reilly: $25,100. *See* R.192. Included in these sums are $25,000 in punitive damages per plaintiff. *Id.*; *see also* R.191 at 40 (finding that punitive relief is appropriate, given that Riverboat "acted willfully and wantonly in its dismissal of each of the plaintiffs").

and by general maritime law, *see id*. at 37-39. The court, however, rejected the plaintiffs' request for attorneys' fees, concluding that, as a general matter, fees are available only when explicitly authorized by statute. *See id.* at 42-43.

After the district court denied Riverboat's post-trial motion to set aside the judgment, Riverboat timely appealed. The plaintiffs subsequently filed a timely notice of cross-appeal, challenging the district court's judgment as it relates to Mr. Horton and Mr. Doncet, as well as the denial of the plaintiffs' request for attorneys' fees.

## II

### APPELLATE JURISDICTION

We first must resolve the question of whether the district court's decision constituted a final judgment—a prerequisite to exercising jurisdiction over this appeal. *See* 28 U.S.C. § 1291. Showboat contends that, as of October 21, 2004, the date that Riverboat filed its notice of appeal, there were two issues still pending in the district court that deprived its judgment of finality. First, the plaintiffs' claims against Showboat had been settled and severed from the proceedings between the plaintiffs and Riverboat, but not yet dismissed. Second, Showboat's cross-claim against Riverboat, alleging that Riverboat was exclusively responsible for all employment matters on the *M/V Showboat* and seeking reimbursement for the costs of settlement with the plaintiffs, also severed from the case now before us, has not yet been dismissed by the district court.

Upon careful examination of the record, we are confident that the pendency of these two matters does not deprive us of jurisdiction to review the judgment of the

district court with respect to the plaintiffs' claims against Riverboat and Riverboat's counterclaim against Showboat for indemnification.

On August 13, 2002, the district court severed the plaintiffs' claims against Showboat from the plaintiffs' claims against Riverboat under Federal Rule of Civil Procedure 21. *See* R.168. At the same time, the district court also severed Showboat's cross-claim against Riverboat from the plaintiffs' claims against Riverboat. *Id.*

As a general matter, Rule 21 severance creates two discrete, independent actions, which then proceed as separate suits for the purpose of finality and appealability. We first adopted this rule in *Hebel v. Ebersole*, 543 F.2d 14 (7th Cir. 1976), when we held that, because the claims resolved by the district court and those remaining in that court had been severed pursuant to Rule 21, that court's judgment was "final and properly appealable." *Id*. at 17. This rule enjoys continued vitality. *See Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1014 n.8 (7th Cir. 2000) ("If the district court severed [the claims against the successor corporation] under Rule 21, then it created two separate actions, each capable of reaching final judgment and being appealed.").[17]

---

[17] Almost all of the circuits have adopted this same approach to Rule 21 severance. *See, e.g.*, *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 560 (1st Cir. 2003) (holding that the Rule 21 severance rendered the district court verdict a "final and appealable judgment under 28 U.S.C. § 1291"); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 231 n.3 (3d Cir. 1998) ("A severed claim [under Rule 21] proceeds as a discrete suit and results in its own final judgment from which an
(continued...)

The district court clearly and unambiguously classified its severance order as one "pursuant to Federal Rule of Civil Procedure 21." R.168 at 1, 7 (holding that, because they are "distinct and separate," it had "broad discretion . . . under Rule 21" to sever the plaintiffs' claims against Riverboat from what remained of the plaintiffs' claims against Showboat). Nevertheless, because "the district court cannot by this characterization of its order create a severance under Rule 21 where one did not exist before," *United States v. O'Neil*, 709 F.2d 361, 368 (5th Cir. 1983), we necessarily must examine whether the district court erred in classifying its severance order as a Rule 21 order rather than a severance under Federal Rule of Civil Procedure 42(b).

---

[17] (...continued)

appeal may be taken."); *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1519 (10th Cir. 1991) ("[W]here certain claims in an action are properly severed under Fed. R. Civ. P. 21, two separate actions result; a district court may transfer one action while retaining jurisdiction over the other."); *United States v. O'Neil*, 709 F.2d 361, 368 (5th Cir. 1983) ("Severance under Rule 21 creates two separate actions or suits where previously there was but one. Where a single claim is severed out of a suit, it proceeds as a discrete, independent action . . . . The presence of unresolved claims in the other action does not of itself implicate Fed.R.Civ.P. 54(b), because that Rule applies only where the unresolved claims are in the same action or suit."); *Spencer, White & Prentis, Inc. v. Pfizer, Inc.*, 498 F.2d 358, 361 (2d Cir. 1974) ("[A]ppeal from a judgment on a validly severed single claim may be timely taken as of right notwithstanding the pendency of the remaining claims or counterclaims . . . ."); *see also* 7 Wright & Miller, *Federal Practice & Procedure* § 1689 (2001) ("Once a claim has been severed [under Rule 21] . . . it proceeds as a discrete unit with its own final judgment, from which an appeal may be taken.").

The distinction between the two rules is jurisdictionally significant: "A separate trial order under Rule 42(b) is interlocutory and non-appealable." *Reinholdson v. Minnesota*, 346 F.3d 847, 850 (8th Cir. 2003). By contrast, "[s]everance under Rule 21 creates two separate actions or suits where previously there was but one. Where a single claim is severed out of a suit, it proceeds as a discrete, independent action, and a court may render a final, appealable judgment in either one of the resulting two actions notwithstanding the continued existence of unresolved claims in the other." *O'Neil*, 709 F.2d at 368.[18] We review the district court's decision to sever the plaintiffs' claims against Showboat from their claims against Riverboat under Rule 21, rather

---

[18] Moore's Federal Practice explains the difference between Rule 21 and Rule 42(b) severance as follows:

> Severance under Rule 21 results in separate actions. A single claim that is severed from a multiclaim action "may be . . . proceeded with separately." In other words, the severed claim proceeds as a discrete, independent suit. It and the original case result in their own separate final judgments from which appeals may be taken. If a severed claim is one of multiple claims asserted by a single plaintiff against a single defendant (or vice versa), neither party is severed from the original action. Rather, both parties are involved in two separate actions. In contrast, an order of separate trials does not result in the filing of separate cases. Instead, it simply leads to two or more separate factual inquiries in the context of a single, properly joined case. No matter how many separate trials the court may order, they remain part of a single case. While judgment on a severed claim is final for purposes of appeal, judgment on a claim tried separately is not an appealable final judgment, unless certified for immediate appeal under Rule 54.

4 Moore's Fed. Practice § 21.06 (2005).

than under Rule 42(b), for abuse of discretion. *See Rice*, 209 F.3d at 1016 ("It is within the district court's broad discretion whether to sever a claim under Rule 21."); *Hebel*, 543 F.2d at 17.

The district court did not abuse its discretion in severing the plaintiffs' claims under Rule 21 rather than under Rule 42(b). We have held previously that a district court may sever claims under Rule 21, creating two separate proceedings, so long as the two claims are "discrete and separate." *Rice*, 209 F.3d at 1016. In other words, one claim must be capable of resolution despite the outcome of the other claim. *Id.* By contrast, bifurcation under Rule 42(b) is appropriate where claims are factually interlinked, such that a separate trial may be appropriate, but final resolution of one claim affects the resolution of the other. *See, e.g.*, *Reinholdson*, 346 F.3d at 850 (holding that, because the "trials of [the] individual claims may expose issues of systemic violation that would cause the district court to reconsider its decision to dismiss plaintiffs' claims against the State defendants in their entirety," severance under Rule 21 was inappropriate; instead construing the district court's order as an order for separate trials under Rule 42(b), such that the individual claims may not be appealed until "a final judgment has been rendered in the entire action").

In *Rice v. Sunrise Express*, 209 F.3d at 1016, we addressed when Rule 21 severance constitutes an abuse of discretion. There, the plaintiff sued Sunrise Express, Inc. for violation of the Family and Medical Leave Act. At a pre-trial conference, the district court raised the concern that Gainey Corporation might be liable as a successor corporation to or as a joint employee of Sunrise. The parties stipulated that Gainey was not the successor corporation and the case proceeded to trial before a magistrate judge. On appeal,

Sunrise contended that the order below was not final because Gainey had not consented to the jurisdiction of the magistrate judge. We held that the district court, as indicated by a *nunc pro tunc* order and acting pursuant to Rule 21, previously had severed Gainey from the proceedings. We further found that severing Gainey under Rule 21, as opposed to under the bifurcation procedures set forth in Rule 42(b), did not constitute an abuse of discretion:

> As long as there is a discrete and separate claim, the district court may exercise its discretion and sever it. Here, the district court effectively took Gainey, and the separately pled claim for successor liability against Gainey, out of the suit. . . . Because Gainey did not face primary liability, and, in all likelihood, no liability at all, its presence was not necessary, and, in the view of the district court, its removal significantly simplified the case.

*Id.*

The same is true here as well. At the time that the district court issued its severance order, the "Showboat defendants [had] indicated to the court that all of the plaintiffs' claims against them ha[d] been settled." R.168 at 2. Showboat's only remaining claim was its indemnification claim against Riverboat. This claim rests on section 3 of Showboat's agreement with Riverboat and claims that Riverboat had the "sole authority" to terminate the plaintiffs. R.37 at 6. If so, Showboat contends, it had no responsibility for the plaintiffs' discharges. By contrast, after severance, the present case involved only the plaintiffs' claims against Riverboat and Riverboat's claim for indemnification against Showboat. Notably, Riverboat's indemnification claim rests on the insurance clause in section 5 of the Agreement and is

completely independent, both theoretically and practically, of Showboat's claim against Riverboat.

The issues raised by Showboat's severed cross-claim are also "discrete and separate," *Rice*, 209 F.3d at 1016, of the claims raised by the plaintiffs against Riverboat. The plaintiffs' claims require an analysis of the legal requirements of § 2114, including whether Riverboat officials who were "individual[s] in charge of [the] vessel," § 13(a), 98 Stat. at 2863, were motivated by a retaliatory animus in terminating the plaintiffs. Showboat's claim, by contrast, mandates an analysis of the contractual relationship between Showboat and Riverboat and of whether the actions of Showboat, as an "owner" of the vessel, *id.*, constitute a "manner of discrimination," rendering indemnification improper, R.99 at 9. While the facts underlying these claims overlap, the claims are independent of one another. Riverboat's liability is unaffected by whether Showboat *also* was involved in the decision to discharge the plaintiffs; even if Mr. Wallace of Showboat gave a directive to terminate the plaintiffs or otherwise affected the termination decision, Mr. Gourguechon of Riverboat also is alleged to have played (and did play) a key role in that decision, making Riverboat liable for retaliatory discharge. Similarly, Showboat could be held liable as an "owner" of the vessel absent a finding that the "individual[s] in charge of [the] vessel" retaliated against the plaintiffs. § 13(a), 98 Stat. at 2863. Because the issues raised by Showboat's claim against Riverboat and those raised by the plaintiffs' claims against Riverboat are easily separable for analysis, the district court did not abuse its discretion in finding that the severance would simplify the proceedings.

In short, while the overall financial exposure of Riverboat or Showboat will be affected by the final outcome of both

actions, the claims in each action are clearly independent of each other. *See Rice,* 209 F.3d at 1016 (holding the indemnification claims to be severable under Rule 21 from the primary liability inquiry). The validity of the claims before us does not depend, as a matter of law, on the outcome of the severed claims.

Therefore, by virtue of its Rule 21 order, the district court, in the exercise of its sound discretion, initiated two separate proceedings: (1) the plaintiffs' suit against Riverboat, from which Riverboat's counterclaim against Showboat flows; and (2) the plaintiffs' suit against Showboat, from which Showboat's cross-claim against Riverboat arises. Post-severance, these suits are independent for purposes of appellate jurisdiction. As a result, the plaintiffs' severed claims against Riverboat reached "final decision[]," 28 U.S.C. § 1291, vesting jurisdiction in this court without regard to the disposition of the plaintiffs' claims against Showboat. The same is true of the relationship between the current appeal and Showboat's cross-claim against Riverboat. While the cross-claim is still pending in the district court, it has no impact on our jurisdiction under § 1291: Because the cross-claim logically stems from the plaintiffs' claims against Showboat, rather than from the plaintiffs' claims against Riverboat, and because these two sets of claims previously were severed, Riverboat's present appeal and the resolution of Showboat's cross-claim can be "proceeded with separately." Fed. R. Civ. P. 21.

## III

## ANALYSIS

### A.  Statutory Protection Under 46 U.S.C. § 2114

At the time of the events in this case, 46 U.S.C. § 2114(a) provided that:

> An owner, charterer, managing operator, agent, master, or individual in charge of a vessel may not discharge or in any manner discriminate against a seaman because the seaman in good faith has reported or is about to report to the Coast Guard that the seaman believes that a violation of this subtitle, or a regulation issued under this subtitle, has occurred.

§ 13(a), 98 Stat. at 2863.[19] The statute authorizes a seaman to bring an action in an "appropriate [United States] District Court" and to seek reinstatement with back pay, as well as "any other appropriate relief." § 13(b), 98 Stat. at 2864.

Section 2114 is intended to facilitate Coast Guard enforcement of maritime regulations by ensuring that the Coast Guard is aware of potential safety violations that could endanger vessels, their passengers and their crew. The statute accomplishes this goal by guaranteeing that, when seamen provide information of dangerous situations to the Coast Guard, they will be free from the "debilitating threat of employment reprisals for publicly asserting company violations" of maritime statutes or regulations. *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 478 (3d Cir. 1993) (discussing a similar retaliatory discharge provision in the Clean Water Act).

---

[19] This provision was amended by the Maritime Transportation Security Act of 2002, *see* Pub.L. 107-295, § 428(a), 116 Stat. 2064 (2002), which expanded the protections available to seamen and made available an award of attorneys' fees. These amendments became effective after the events in this case took place, and Congress expressed no clear intent to make the amendments retroactive; neither party asks that these amendments be applied here.

We must decide whether the plaintiffs' correspondence
with the Coast Guard qualifies for protection under § 2114
and, if so, whether the plaintiffs were terminated in retalia-
tion for this protected activity. Riverboat submits that the
district court erred in concluding that the plaintiffs' corre-
spondence constituted a "report" of a safety violation and
in holding that the plaintiffs established that they acted in
"good faith" in corresponding with the Coast Guard. We
shall address each of these contentions.

### 1.  Whether the Plaintiffs' Correspondence is Protected by the Statute

Riverboat contends that the plaintiffs' correspondence
with the Coast Guard is not entitled to statutory protection
under § 2114 because it did not constitute a "report." In
support of this contention, Riverboat relies upon *Garrie v.
James L. Gray, Inc.*, 912 F.2d 808 (5th Cir. 1990). In its view,
*Garrie* stands for the proposition that § 2114 requires a *formal*
complaint be made to the Coast Guard. The district court
did not accept this argument. First, it noted that, although
the plaintiffs' October 10th letter did not "use[] the catch-
word 'report,' " "it is hard to imagine that Congress would
have intended for such specificity," given that "the statute
itself does not prescribe the manner in which such a report
must be made." R.191 at 21. The district court concluded
that the October 10th letter to the Coast Guard satisfied this
requirement. In that letter, the plaintiffs did not merely seek
information. Rather, they made a specific complaint "about
the limited endorsement on the COI and sought its removal:
they reported what they believed was a violation of a safety
law." *Id.*

Whether a particular form of communication qualifies as a "report" under § 2114 is a question of law that we review de novo. *See Olson v. Risk Mgmt. Alternatives, Inc.*, 366 F.3d 509, 511 (7th Cir. 2004) (holding that we review issues of statutory interpretation de novo). As always, when approaching a question of statutory interpretation, "we begin with the plain wording of the relevant statutory provision[]." *United States v. Vitrano*, 405 F.3d 506, 509 (7th Cir. 2005).

When read in isolation, the term "report" arguably could have more than one meaning.[20] However, we do not read a word or words of a statute in isolation; rather, we read them in the context in which they appear in the provision. When read in its entirety, the purpose of § 2114 is quite clear. Its import is to ensure that the United States Coast Guard receives accurate and timely information about the violation of safety regulations so that it in turn may fulfill its statutory obligations to keep vessels and those who voyage in them safe and to keep the lanes of maritime transportation free from hazards and impediments. From the Coast Guard's perspective, being "always prepared"[21] requires timely and

---

[20] One legal dictionary defines the term "report" as an "official or formal statement." *Black's Law Dictionary* 1464 (4th ed. 1968). Other sources, however, indicate that the definition of "report" is more broad, including a detailed account not limited by its purpose, content or form. *American Heritage Dictionary of the English Language* (4th ed. 2000).

[21] The motto of the United States Coast Guard is "Semper Paratus"—"Always Prepared." The Coast Guard's mission includes: "(A) Marine safety[;] (B) Search and rescue[;] (C) Aids to navigation[;] (D) Living marine resources (fisheries law

(continued...)

accurate information. In this context, we cannot attribute to Congress the intent to give the term "report" a narrow or formal meaning. Seamen are not professional report writers; they staff ships and have the skills necessary to their appointed role on the crew and to ensure the vessel's safe and efficient passage. The obvious point of the term "report" in § 2114, plainly and fairly read, is to require that the crew member's message to the Coast Guard addresses a safety violation and contains sufficient detail to apprise the Coast Guard of the nature of the alleged violation. To require any further formality would narrow the statute in a manner that Congress clearly avoided, and, in the process, would frustrate the clear purpose of the provision.

We note that our interpretation of the statutory language comports with the legislative history of the provision. Section 2114 was intended as a response to the Fifth Circuit's decision in *Donovan v. Texaco, Inc.*, 720 F.2d 825 (5th Cir. 1983). *See* S. Rep. No. 98-454, at 12 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4831, 4842. *Donovan*, which was decided before seamen were covered by a specific retaliatory discharge provision, involved an engineering officer who corresponded with the Coast Guard in a manner similar to the plaintiffs in this case. He placed a phone call to the Coast Guard to complain about the condition of certain generating equipment on the vessel; after he was demoted, and later terminated, he filed suit under the Occupational

---

(...continued)

enforcement)[;] (E) Marine environmental protection[;] [and] (F) Ice operations." 6 U.S.C. § 468(a)(1). The Coast Guard also is responsible for assisting in "homeland security missions," which encompasses: "(A) Ports, waterways and coastal security[;] (B) Drug interdiction[;] (C) Migrant interdiction[;] (D) Defense readiness[;] [and] (E) Other law enforcement." *Id*. § 468(a)(2).

Safety and Health Act ("OSHA"), claiming that his discharge was motivated by retaliatory animus. The Fifth Circuit held that OSHA's prohibition against retaliatory discharge of a complaining employee does not apply to seamen. *Donovan*, 720 F.2d at 828-29. Congress signaled its disagreement with the result in *Donovan* by enacting § 2114. It made clear that, although OSHA does not forbid retaliation against seamen, termination for corresponding with the Coast Guard also should be protected by statute. Notably, Congress took this action even though the *Donovan* plaintiff never memorialized his complaint in a formal written statement. This history— coupled with Congress' decision not to define "report" in the statute or in the course of discussing *Donovan* in the relevant legislative history—supports the conclusion that § 2114 does not require a formal complaint, or even a written statement, as a prerequisite to statutory whistleblower protection.[22]

This conclusion is bolstered by the holding of the only other federal appellate case to address the requirements of § 2114. In *Garrie*, 912 F.2d 808, the plaintiff had placed a phone call to the Coast Guard to discuss his employer's violation of a regulation setting maximum working hours for officers on the vessel. The plaintiff identified himself, but not his employer; he never indicated to the Coast Guard that he wished to file a complaint; and he testified that his main purpose in calling was to "get information about running

---

[22] Moreover, both at the time of the events in this case and in its current form, § 2114 protects a seaman who "has reported or is *about to report*" the violation of safety regulations to the Coast Guard. *Compare* 46 U.S.C. § 2114 (emphasis added), *with* Pub.L. No. 98-557, § 13(a), 98 Stat. 2863 (1984) (current version at 46 U.S.C. § 2114 (2002)). This statutory language suggests that Congress is focused less on the nature, or even the existence, of the report than on the fact that communication was made.

times" and to "verify his understanding of the applicable rules," rather than to request that the Coast Guard take any particular action. *Id.* at 812 (internal quotation marks omitted). The Fifth Circuit concluded that, because the plaintiff "did [not] reveal the name of his employer or the vessel upon which he was employed— information without which the Coast Guard could not investigate or prosecute a violation"—the communication could not be considered a "report." *Id.* Although Riverboat relies on this case as establishing that § 2114 requires a formal complaint be made by the seaman, we instead believe that *Garrie* held simply that, had sufficient information been conveyed to the Coast Guard, such as the name of the seaman's vessel, his employer and the nature of the safety violation, the communication would have been within the ambit of the statute's protection despite the absence of a formal complaint. So long as the correspondence makes clear that the seaman is reporting a specific regulatory violation with respect to a vessel, the statute protects the reporting crew member.

Therefore, the plaintiffs' October 10th letter clearly qualifies as a "report": It identified the company responsible for the alleged regulatory violation, the vessel in question, the plaintiffs' employer, as well as the Coast Guard department that had granted the amended COI. In sum, the letter put the Coast Guard on notice that, in the view of the crew members, the ship was being operated in derogation of applicable regulations. This communication was, in both purpose and effect, just the sort of communication protected by the statute.[23]

---

[23] Riverboat also contends that the October 10th letter was not a "report" because, at the time the letter was received, the Coast
(continued...)

### 2. "Good Faith" Belief

Riverboat further contends that the plaintiffs did not have a "good faith" belief that a violation of safety regulations had occurred when they contacted the Coast Guard, but instead were acting in their own self-interest, primarily motivated by job and wage preservation. The district court rejected this contention; it made factual findings that the plaintiffs genuinely believed that the relaxation of licensing requirements on board the *M/V Showboat* threatened the safety of the vessel and its passengers. "Each of the plaintiffs," the district court explained, "testified that his main concern regarding the COI was that the vessel would be unsafe if limited license engineers were allowed to do the work of unlimited license engineers." R.191 at 8. And, although some of the plaintiffs admitted that they "never

---

[23] (...continued)

Guard already was aware of the licensing changes in *M/V Showboat*'s COI. This contention, despite having a superficial appeal, cannot be squared with our obligation to interpret § 2114 in a manner consistent with its evident purpose of promoting compliance with maritime statutes and regulations. The plaintiffs' correspondence with the Coast Guard plainly furthered that goal; there is no evidence that the Ninth District Coast Guard Commander, who ultimately was responsible for revoking the limited endorsement, knew before the plaintiffs informed him that subordinates had granted a waiver of licensing requirements for the *M/V Showboat*. Indeed, so far as this record suggests, it is *because of* the plaintiffs' October 10th appeal that the Coast Guard revoked the endorsement, aligning the employment practices of the *M/V Showboat* with the maritime regulations governing officer licensing. *See* 46 C.F.R. §§ 10.501, 15.915. Therefore, the plaintiffs' October 10th letter properly qualifies as a "report."

told the Captain of the vessel not to take the ship out because it was unsafe," *id.*, the district court concluded that these witnesses were credible with respect to their good faith belief, *id.* at 22.

A district court's findings of fact made after a full bench trial are entitled to great deference and shall not be set aside unless they are clearly erroneous. *See* Fed. R. Civ. P. 52(a); *see also Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005) (noting that this is a "highly deferential standard"). "A finding of fact is clearly erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 847 (7th Cir. 2005). "If there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous." *Id.* This rule holds special force in the context of a district court's assessment of a witness' credibility; "we have stated that a trial court's credibility determination can virtually never amount to clear error." *Id.* at 848 (internal quotation marks omitted).

The record does not justify a conclusion that the district court's factual findings about the plaintiffs' good faith belief are clearly erroneous. The district court heard first-hand the plaintiffs' testimony and assessed the demeanor of those witnesses. After carefully examining the other evidence in the case, the court concluded that, when making their report to the Coast Guard, the plaintiffs did not have an ulterior motive but instead believed that the relaxation of licensing requirements threatened the safety of the vessel and its passengers. The record contains testimony that supports the conclusion of the district court.[24] We therefore cannot hold

---

[24] *See, e.g.*, Horton Test., Tr.II at 65-66 ("[The report to the Coast
(continued...)

that the district court clearly erred in finding that the plaintiffs honestly believed that the change in licensing requirements for the staff of the *M/V Showboat* was in violation of governing safety regulations.

Riverboat responds that the plaintiffs could not have "reasonabl[y]" believed that the employment of engineers with limited licenses posed a "safety issue." Appellants' Br. at 29. However, § 2114 does not require that a seaman believe that there is a "safety hazard" on board a vessel; rather, it requires that the "seamen believe[] that a violation

---

[24] (...continued)

Guard] was based on our concern for passenger safety. . . . [I]n this case, [the Coast Guard] w[as] actually reducing the minimum requirements, and we were concerned."); Gaffney Test., Tr.I at 119 ("[W]hat they did was they lowered the minimum safety requirements, and we felt that they were in error by reducing the requirements at all. . . . We already thought it was understaffed . . . [i]n the number of officers onboard, and now they're reducing the requirements of what the minimum requirements were to have onboard."); Goodridge Test., Tr.I at 25 ("[W]e were worried about . . . having people there that did not have as much experience as either myself or Bob Gates or the chief engineers there were there [sic] sailing in a chief engineer position."); Anderson Test., Tr.II at 134-35 ("[I signed the October letter because I was worried that] a limited engineer would be allowed on the vessel. . . . [I]t scared me that with two years of sailing experience, I could be a limited chief engineer. And I definitely would not be able to handle a boat like the Showboat."); Bell Test., Tr.II at 194 ("I agreed with the contents of the letter. And basically what the letter was asking for . . . ."); Beardon Test., Tr.II at 273 ("There was a concern for the safety of the passengers, that if engineers with limited experience were able to serve on this vessel, that we may not be able to guarantee the same level of passenger safety as we could with unlimited engineers in the same positions.").

of [U.S. Code Title 46, subtitle II or Coast Guard regulations issued under that subtitle] has occurred." § 13(a), 98 Stat. at 2863. In this case, the plaintiffs reasonably and in good faith believed that the Coast Guard's approval of the *M/V Showboat*'s future employment of unlicensed chief and assistant engineers constituted a "violation of . . . a [Coast Guard] regulation . . . ." § 13(a), 98 Stat. at 2863. Coast Guard regulations provide that a chief or assistant engineer with a limited license is permitted to "serve within any horsepower limitations on vessels of any gross tons on inland waters," but not on a vessel of "more than 1600 gross tons in ocean, near coastal or Great Lakes service." 46 C.F.R. § 10.501(b); *see also* 46 C.F.R. § 15.915. Although, as a general matter, the Coast Guard has discretion to "vary the application of inspection standards based on the intended operation of the vessel," *Smith v. United States Coast Guard*, 220 F. Supp. 2d 275, 282 (S.D.N.Y. 2002) (discussing 46 C.F.R. § 176.800(b)), the Coast Guard is bound by a regulation that specifically restricts the exercise of this discretion. *See Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) ("The Coast Guard, like the military departments and agencies in general, is bound to follow its own regulations."). In this case, 46 C.F.R. §§ 10.501 and 15.915 clearly set forth the conditions under which a chief or assistant engineer with a limited license may serve on a vessel, and by contrast, the conditions under which a limited licensed engineer may not serve. In permitting the employment of chief and assistant engineers with limited licenses on board the *M/V Showboat*—a vessel over 1,600 gross tons and in Great Lakes service—the Coast Guard failed to follow these regulations, and acted beyond the scope of its authority. Even if this was not true, the plaintiffs were reasonable in believing that, in issuing the *M/V Showboat*'s COI, the Coast Guard acted

contrary to the applicable regulations.[25] Therefore, the plaintiffs reporting this violation are entitled to whistle-blower protection under § 2114.[26]

Riverboat, however, responds that the reported violation of a safety regulation must be committed by the employer,

---

[25] The legislative history of § 2114 indicates that Congress intended that the statute provide protection to a plaintiff who honestly believed that there was a regulatory violation, but who turned out to be incorrect. For example, in *Donovan v. Texaco, Inc.*, 720 F.2d 825 (5th Cir. 1983)—the factual scenario that § 2114 was enacted to address—the plaintiff had reported to the Coast Guard an alleged defect in generating equipment on the vessel. After inspection, the Coast Guard determined that the equipment was not defective and that the plaintiffs' belief that there was a safety violation on board was incorrect as a factual matter. Nevertheless, according to the legislative history, because the *Donovan* plaintiff honestly believed when making the report that there was a violation of governing safety regulations, he was entitled to whistleblower protection. *See* S. Rep. No. 98-454, at 12 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4831, 4842.

[26] Riverboat also submits that, by issuing the April 1997 amended COI, the Coast Guard "directly informed the plaintiffs . . . that employing limited licensed engineers was not a safety concern." Appellants' Br. at 30. Therefore, according to Riverboat, the plaintiffs could not have believed reasonably that employment of engineers with limited engineering licenses posed a safety hazard. *Id.* However, as discussed in the text, that the plaintiffs believed that the employment of unlicensed engineers was a "safety concern" is not a prerequisite to statutory protection. Instead, the plaintiffs are entitled to whistleblower protection because they reasonably and in good faith believed that the Coast Guard, by granting Riverboat's petition for variance from the licensing requirements set forth in 46 C.F.R. §§ 10.501 and 15.915, committed a violation of those regulations.

rather than by the Coast Guard. Moreover, Riverboat submits that, at the time the plaintiffs' letters were sent to the Coast Guard, neither Showboat nor Riverboat had yet hired an engineer with a limited license, and therefore, they were technically in compliance with their COI, as well as with Coast Guard regulations. *See* 46 C.F.R. §§ 10.501, 15.915. Consequently, according to Riverboat, the plaintiffs "as a matter of law" could not have believed in good faith that a violation of statute or regulation had occurred. Appellants' Br. at 28. By contrast, the plaintiffs submit that § 2114 does not limit its protection to a report of a safety violation committed by their employer; instead, the statute encompasses the report of a violation of safety regulations committed by less senior officers of the Coast Guard. The district court resolved this dispute in favor of the plaintiffs. According to the court, less senior Coast Guard authorities committed a "violation" cognizable under § 2114 when they issued the amended COI under circumstances in which departure from governing regulations was not compatible with the safety of the vessel. Therefore, in reporting this violation, the plaintiffs fell within the ambit of § 2114's protections.

Here, we must ask whether § 2114 protects a seaman who reports a violation committed by a third party such as the Coast Guard upon application of the employer. This is a question of statutory interpretation that we review de novo. *See Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005). As we have noted earlier, when interpreting a statute, we must begin with the plain wording of the provision.

We hold that the language of the statute makes clear that the reporting of such a violation is covered. Section 2114 provides that a seaman is entitled to protection if he reports that he "believes that a violation of this subtitle, or a regulation issued under this subtitle, has occurred." § 13(a),

98 Stat. at 2863. By employing passive language and by not specifying *whose* safety violation must have occurred for a seaman to receive protection under the statute, the statutory language evinces a deliberate choice on Congress' part to protect a seaman who reports a violation by either an employer or a non-employer.[27]

The purpose of § 2114 further supports reading its plain language to protect a seaman who reports a regulatory violation that has the approval of less senior authorities in the Coast Guard. As we have noted earlier, whistleblower protections, such as § 2114, are designed to encourage employees to aid in the enforcement of maritime laws and Coast Guard regulations by making claims through pro-

---

[27] Riverboat relies upon *Seymore v. Lake Tahoe Cruises, Inc.*, 888 F. Supp. 1029 (E.D. Cal. 1995), for the proposition that § 2114 is not designed to "turn seamen into private enforcers of Coast Guard regulatory decisions." *Id.* at 1033 (quoted in Appellants' Br. at 35). *Seymore*, however, is inapposite. It addressed a narrow factual scenario not at issue in this case. There, the plaintiff had refused a management directive to take the vessel out to sea because of a safety violation; he never made a report to the Coast Guard. The *Seymore* court denied whistleblower protection to the plaintiff. It contrasted § 2114 with § 11(c) of OSHA, *see* 29 U.S.C. § 660(c), which "proscribes retaliatory discrimination . . . because of the exercise by [an] employee on behalf of himself or others of any right afforded by [OSHA]," 888 F. Supp. 2d at 1033 (alteration in original). The court then held that § 2114 does not protect the exercise of rights afforded by law or regulation; instead, it concluded, it "provides only a narrow protection for reporting violations to the Coast Guard." *Id.* at 1034. *Seymore* simply does not discuss the question we now face: *whose* safety violation the complaint to the Coast Guard must report.

tected channels.[28] This purpose certainly is served by a report of an employer's imminent violation, even when the violation already has the approval of Coast Guard personnel, given that those individuals do not have the last word on enforcement matters.

## B. Causation

Now that we have determined that the plaintiffs' correspondence with the Coast Guard is protected under § 2114, we must decide whether the district court correctly determined that the plaintiffs were terminated in retaliation for having sent this correspondence to the Coast Guard.[29]

---

[28] *Cf. Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 479 (3d Cir. 1993) (noting, in the context of interpreting retaliatory discharge provisions of the Clean Water Act, that broad whistleblower "protection is necessary to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses" (internal quotation marks omitted)).

[29] We pause here to address Riverboat's contention that the district court erred in not entering judgment in its favor at the close of the plaintiffs' case-in-chief. According to Riverboat, the plaintiffs failed to present a prima facie case of retaliatory discharge, requiring the district court to "direct a verdict" in its favor. Appellants' Br. at 19.

As a preliminary matter, because this is a bench trial, we construe Riverboat's motion as a Rule 52(c) motion for judgment on partial findings, rather than as a motion for a directed verdict. *See* Fed. R. Civ. P. 52(c) ("If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter

(continued...)

At the bench trial, the parties presented very different factual scenarios. In the plaintiffs' view, their discharges were the direct result of their communication with the Coast Guard about the staffing of the vessel. The defendants contended, however, that the discharges were due to the

---

(...continued)

of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue . . . ."). A district court is not *required* to make findings of fact on a Rule 52(c) motion; the Rule merely "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." Fed. R. Civ. P. 52(c) advisory committee's notes (1991 amendments). "As under the former Rule 41(b), the court retains discretion to enter no judgment prior to the close of the evidence." *Id.* In light of the substantial evidence supporting the court's finding of causation, *see infra*, we cannot conclude that the district court's decision not to rule on the Rule 52(c) motion was an abuse of discretion.

Riverboat also asserts that, in reviewing the district court's decision, we should evaluate the record at the close of the plaintiffs' case—the time at which the motion was made—rather than the record as a whole. Riverboat's position is not supported by our case law nor by Rule 52(c). The defendants can point us to no rule of law that prohibits us, in reviewing the district court's Rule 52(c) order, from evaluating the record as a whole. *See Duval v. Midwest Auto City, Inc.*, 578 F.2d 721, 723-24 (8th Cir. 1978) (holding that, once a defendant introduces evidence on its own behalf, it waives the right to dismissal under Rule 41(b) [now Rule 52(c)] and stating that "[i]n such situations the sufficiency of the evidence is tested on appeal by viewing the *entire record*," even when "the trial judge reserved ruling on the motion when made" (emphasis added)).

plaintiffs' union activities and concomitant actions that compromised Riverboat's business success.

The district court resolved this dispute definitively. Sitting as the trier of fact, the court decided that Riverboat's case was simply not worthy of belief. In its order following the submission of post-trial briefs, the court characterized as based on "speculation and conjecture" the testimony of Mr. Gourguechon and of Mr. Heitmeier that the plaintiffs were fired because of their refusal to join a union other than MEBA and because they may have been involved in sabotaging wiring aboard the vessel and causing expensive transformers to blow. R.191 at 27. The court found no specific evidence of sabotage and no evidence that the plaintiffs were involved in the rewiring problems that led to the blown circuit breakers. *Id.* Indeed, the court noted that there was evidence that the wiring had to be done under time constraints—evidence that was quite compatible with the plaintiffs' testimony that the wiring was first replaced temporarily and later brought up to code specifications.[29] *Id.* The district court also found the defendants' testimony on the reasons for the plaintiffs' discharges to be unworthy of belief because, at each stage of the proceedings, the defen-

---

[29] *See, e.g.*, Gaffney Test., Tr.I at 260-62 (explaining that the wires, as temporarily replaced, were not dangerous); Doncet Test., Tr.III at 67 (testifying that the crew was told by Mr. Gourguechon to leave the wires as they were, to be "taken care of later on as things progressed"); Reilly Test., Tr.III at 162 (stating that wiring was not in compliance with governing regulations, but "[i]n the short term, absolutely, it was very safe"; also testifying that the crew's long-term intention was to bring the wiring "up to code").

dants offered a different justification for the firings.[30] The district court believed that this pattern supported the conclusion that the defendants first fired the plaintiffs and then came up with *post hoc* rationalizations for having done so. Management's letter of discharge to Mr. Gaffney, which was drafted the day that the amended COI was posted, specifically stated that the reason for his discharge was his contact with the Coast Guard; there was no reference to union activities or to sabotage. The other plaintiffs were terminated in rapid succession—all within two weeks of the Coast Guard's revocation of the limited endorsement. Although their termination letters did not include the reason for termination set out in Mr. Gaffney's letter, the district court thought the difference was quite explainable because, upon receipt of his letter, Mr. Gaffney had told Mr. Gourguechon that he legally could not be discharged because he had contacted the Coast Guard. *Id.* at 28-29.

---

[30] For example, at trial, the defendants posited that the plaintiffs were terminated because of "a pattern of disruptive activity." Gourguechon Test., Tr.IV at 19. The defense also claimed that *all* the plaintiffs were involved in some form or another in the rewiring incident. *See id.* at 38-41 (testifying that each of the plaintiffs were part of, or had "more or less direct responsibility" over, the work crews involved in the incident). However, these rationales directly conflict with those previously relied upon. At the NLRB proceedings, for instance, Mr. Gourguechon explained that Mr. Bell was fired because of his "rough" "bedside manner," R.70 at 64; that Mr. Gaffney was fired for not following the "chain of command," *id.* at 35; that Mr. Trundy and Mr. Doncet were fired to get a "different group of people, different skills" in the engine room, *id.* at 44, 46; and that Mr. Goodridge was fired because it was "time to make a change in the crew," *id.* at 53.

Returning to this issue once again in the course of ruling on the Rule 52 and Rule 59(b) motions, the district court repeated its earlier analysis and then pointedly said that the "defendants' motivation for firing the plaintiffs was because the plaintiffs reported to the Coast Guard that the COI violated safety regulations. This was the sole reason that the defendants fired the plaintiffs, not based on later asserted allegations of sabotage or union activity." R.199 at 8.

When a district court makes findings of fact regarding causation, as it did in this instance, those findings are conclusive and binding upon this court unless they are clearly erroneous. *Jutzi-Johnson v. United States,* 263 F.3d 753, 763 (7th Cir. 2001) (discussing factual findings as to the existence of proximate cause). Although the record does contain evidence that *if* believed by the trier of fact might have led to a different conclusion, the record also contains the evidence relied upon by the district court to reach the conclusions that it did. *See id.* ("[A] district court's choice between two permissible inferences from the evidence cannot be clearly erroneous." (internal quotation marks omitted)). Accordingly, we must accept those findings.

Riverboat urges us to reverse the district court's findings because, even if the Coast Guard correspondence played a marginal role in the termination decisions, the "motivating cause" for terminating the plaintiffs was their union activities. Appellants' Br. at 40. As is made clear by the legislative history, the private right of action made available under § 2114 was modeled after OSHA's retaliatory discharge provision, 29 U.S.C. § 660(c). *See* S. Rep. No. 98-454, at 12 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4831, 4842. Under OSHA, in order for a plaintiff to establish that he was terminated in retaliation for filing a health or safety complaint, he must show that the "protected activity was a

substantial reason for the action," although it "need not be the sole consideration behind discharge." 29 C.F.R. § 1977.6(b). In such circumstances, as under § 2114, the ultimate question is whether the discharge or other adverse action would have "taken place 'but for' engagement in protected activity." *Id.; see also Dole v. H.M.S. Direct Mail Serv., Inc.*, 752 F. Supp. 573, 580 (W.D.N.Y. 1990) (holding that, although the plaintiff was a "problem employee" and eventually may have been terminated for that reason, the immediate cause of his termination was the OSHA report); *Donovan v. Commercial Sewing, Inc.*, 562 F. Supp. 548, 552-53 (D. Conn. 1982) (concluding that the OSHA complaint was the but-for cause of the plaintiff's termination, given the temporal connection between that complaint and the subsequent termination). In this case, however, a mixed-motive or "but for" analysis is not necessary. The district court specifically found that the defendants did not act from a mixed motive but from a *sole* motive—the plaintiffs' correspondence with the Coast Guard.

The defendants also contend that the district court erred in failing to engage in *McDonnell Douglas*' burden-shifting analysis. As in the case of the OSHA statute, we have no doubt that a defendant can defend against an allegation that he discharged a seaman in retaliation for reporting a matter to the Coast Guard by introducing evidence that the discharge was non-pretextually based on another, legally permissible ground. Indeed, the defendants in this case attempted to avail themselves of just such a defense. However, the findings of the district court that the evidence proffered by the defendants was not worthy of belief simply precludes this defense.

Moreover, the availability of the defense of a non-pretextual reason for discharge does not necessarily make

the *McDonnell Douglas* paradigm the appropriate analytical tool for the evaluation of this defense. We have held repeatedly that the *McDonnell Douglas* burden-shifting method of proof is relevant only before trial, both to determine whether the plaintiff has met her burden of creating a triable issue of material fact and to determine the sequence of presenting evidence at trial. *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) ("The judge on his own initiative gave a *McDonnell Douglas* instruction despite tireless repetition by appellate courts that the burden-shifting formula of that case is not intended for the guidance of jurors; it is intended for the guidance of the judge when asked to resolve a case on summary judgment.").

### C.  Mr. Doncet and Mr. Horton

The district court entered judgment in favor of all but two plaintiffs—Mr. Doncet and Mr. Horton. It held that there was no evidence that Riverboat executives were aware that these individuals were involved in a report of a violation of safety regulations prior to their terminations. *See* R.191 at 21. The plaintiffs signed only the August letter, not the October 10th letter; according to the district court, there is no evidence that Mr. Gourguechon read the August letter or that the August letter qualified for statutory protection under § 2114 as a "report." Therefore, according to the district court, Mr. Doncet and Mr. Horton did not meet their burden of proving that they were terminated in retaliation for protected correspondence with the Coast Guard. We review this finding of fact for clear error.

Although Mr. Doncet and Mr. Horton did not sign the October 10th "report," the facts of the case compel a finding

that the defendants believed them to be involved in protected communications with the Coast Guard. On January 13, 1998, five of the ten plaintiffs filed a complaint in the district court. This complaint, to which were attached the four letters sent to the Coast Guard during August, September and October of 1997, was served on the *M/V Showboat* on January 14, 1998. The defendants admit having seen and read these attached letters at this time. *See* R.69, Ex.B at 110; Tr.IV at 47. Mr. Doncet and Mr. Horton were terminated shortly thereafter, on January 22 and January 15, 1998, respectively.

As we have noted earlier, the district court found that, although the termination letters delivered to seven of the prevailing plaintiffs did not contain explanations for their discharges, like Mr. Gaffney's letter, the timing and circumstances prove that these plaintiffs also were fired because of correspondence with the Coast Guard. Specifically, these plaintiffs were "fired in rapid succession and only days after the Coast Guard informed [Riverboat] that it was rescinding the COI limited endorsement." R.191 at 28. The "smoking gun"—Mr. Gaffney's termination letter—also demonstrated retaliation against all eight plaintiffs, given that Mr. Gaffney had "testified that he told the defendants, upon receiving his termination letter, that they could not fire him for the reason stated. The[] rapid firings are at least circumstantial evidence that [all of] the plaintiffs were terminated because of their report to the Coast Guard." *Id.* at 28-29.

We cannot see why these findings do not apply with equal force to the terminations of Mr. Doncet and Mr. Horton. As in the case of the other eight plaintiffs, the defendants were aware of Mr. Doncet and Mr. Horton's involvement in the petition to remove the limited endorsement from the *M/V*

*Showboat*'s COI. Moreover, the terminations of all ten plaintiffs occurred in "rapid succession," *id.* at 28; the terminations of Mr. Doncet and Mr. Horton occurred within eight days after the defendants learned that they had signed the August letter to the Coast Guard. Given this sequence of events, we conclude that there is sufficient evidence linking the report to the Coast Guard to the terminations of Mr. Doncet and Mr. Horton. The district court's contrary conclusion is unsupported by the evidence and, therefore, clearly erroneous.

Riverboat maintains that, unlike the eight prevailing plaintiffs, Mr. Doncet and Mr. Horton did not sign the October 10th letter and therefore never submitted a "report" to the Coast Guard. § 13(a), 98 Stat. at 2863. However, given that the letters were served on the *M/V Showboat* simultaneously and Mr. Doncet and Mr. Horton were terminated shortly thereafter, nearly concurrently with the terminations of the other eight plaintiffs, the logical inference is that the defendants believed that Mr. Doncet and Mr. Horton were involved in a broader effort to obtain the revocation of the licensing waiver. Although timing is not dispositive, *see Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("We have never said that [temporal proximity] is dispositive in providing or disproving a causal link." (internal quotation marks omitted)), it is a significant factor to be considered, particularly when there is "other evidence that supports the inference of a causal link," *id.* Here, the terminations of Mr. Doncet and Mr. Horton followed closely on the heels of the terminations of the other plaintiffs, which we have held were in retaliation for their protected communication with the Coast Guard. As in justifying the terminations of the other plaintiffs, the defendants offered shifting rationales for terminating Mr. Doncet and Mr. Horton. *Compare* Gourguechon Test., R.70 at 46 (testifying at NLRB

proceedings that Mr. Doncet was fired to get a "different group of people, different skills" in the engine room), *with* Gourguechon Test., Tr.IV at 19, 38-41 (testifying at the bench trial that all of the plaintiffs were fired because of their union involvement and concurrent activities). It is also undisputed that the defendants knew that Mr. Doncet and Mr. Horton were involved in the first inquiry to the Coast Guard, a letter which, although classified as a Freedom of Information Act request, also expressed safety concerns with the relaxation of licensing requirements. *See* R.34, Ex.2 (noting that "the relaxation of licensing requirements for the engineers on the M/V Showboat . . . substantially reduces passenger safety by not requiring experienced personnel to crew the vessel"). This document— while not formally a "report"—put the defendants on notice that Mr. Doncet and Mr. Horton were concerned about, and motivated by, the safety implications of hiring engineers with limited licenses. Moreover, the defendants knew that Mr. Gaffney spearheaded the drafting of all four letters attached to the complaint, making reasonable the conclusion that the signatories to these letters were involved in a general, larger effort to petition the Coast Guard for an amended COI. We conclude, on the basis of these pieces of circumstantial evidence, that Mr. Doncet and Mr. Horton's communication with the Coast Guard and their implicit connection to the October "report" was a motiving factor in their discharges, entitling them to whistleblower protection under § 2114. We therefore reverse the judgment of the district court as it relates to Mr. Doncet and Mr. Horton and remand for further proceedings consistent with this opinion, including the calculation of proper damages with respect to these two plaintiffs.

**D. Mr. Heitmeier and Mr. Gourguechon's Liability**

**1. "Individuals in Charge of a Vessel"**

Section 2114, at the time of the events in this case, limited its scope to "owner[s], charterer[s], managing operator[s], agent[s], master[s], [and] individual[s] in charge of a vessel." § 13(a), 98 Stat. at 2863. Riverboat's contention that this language does not encompass either Mr. Heitmeier or Mr. Gourguechon is without merit. The plain meaning of the phrase "individual in charge of a vessel" refers to persons who have "control over or responsibility for" the vessel's operation. A*merican Heritage Dictionary* (4th ed. 2000) (defining the phrase "in charge of"); *see also Black's Law Dictionary* 685 (5th ed. 1979) (defining "in charge of" as "in the care or custody of, or intrusted to the management or direction of"). Mr. Heitmeier, as the President, sole shareholder and member of the Board of Directors of both Riverboat Services, Inc. and Riverboat Services of Indiana, Inc., certainly exercises substantial control over the *M/V Showboat* and its operations; it would be preposterous to suggest otherwise. Similarly, Mr. Gourguechon, as the Director of Marine Operations for Riverboat during the events in this case, was in a position of significant responsibility; among other things, he was in charge of managing the vessel's crew, including making promotion and termination decisions. Indeed, Mr. Gourguechon played a large, if not dispositive, role in the termination decisions in question in this case. Were § 2114 construed so as to not permit the plaintiffs to sue the director of personnel matters—the person actually responsible for the discharges—the statute indeed would be enfeebled. We therefore hold that both Mr. Heitmeier and Mr. Gourguechon qualify as "individual[s] in charge of a vessel" and may be sued in their individual capacities under the terms of § 2114.

**2. Mr. Heitmeier's Liability**

Riverboat also submits that the district court erred in holding Mr. Heitmeier liable, given that, until after this litigation began, he did not know about the plaintiffs' letters to the Coast Guard. Instead, according to the defendants, Mr. Heitmeier believed that the plaintiffs were involved in the disruption and miswiring of the vessel and directed Mr. Gourguechon to fire them for this reason. Specifically, the defendants submit that, at the time of the plaintiffs' discharges, Mr. Wallace

> had at least three "run-ins" with the MEBA, and in one instance, members of the union barged into [Mr.] Wallace's East Chicago office and were escorted out by security. [Mr.] Wallace . . . directed [Mr.] Heitmeier to get rid of any employee involved in the union activity because he did not want to deal with the aggravation of the union activity.

R.191 at 9 (summarizing trial testimony). Mr. Heitmeier, in turn, conveyed this request to Mr. Gourguechon, who was solely responsible for drafting the termination letters and delivering these letters to the plaintiffs.

The district court made factual findings that the defendants' proffered reason for terminating the plaintiffs—primarily their union involvement and related activities—was "unconvincing" and "based on speculation and conjecture." *Id.* at 27. As a general rule, we shall defer to such findings unless they are shown to be clearly erroneous; moreover, these findings are compatible with the district court's conclusion that Riverboat fired the plaintiffs in retaliation for their protected communication with the Coast Guard. *See supra.*

Nevertheless, in Mr. Heitmeier's case, the district court's findings, while affording a factual basis for discrediting Mr.

Heitmeier's given reasons for terminating the plaintiffs, do not provide a basis for establishing the requisite causation between Mr. Heitmeier's direction that Mr. Gourguechon fire the plaintiffs and the retaliation for their report of a violation of safety regulations to the Coast Guard. In finding a causal link between the plaintiffs' communications with the Coast Guard and their subsequent terminations, the district court relied heavily upon the "smoking gun" in the case—Mr. Gaffney's termination letter which cited the Coast Guard correspondence. Although the plaintiffs suggest that Mr. Heitmeier retained supervisory responsibility for the drafting of this letter, the record contains no affirmative evidence to support this contention; there is no evidence that Mr. Heitmeier even knew of the letter's contents before it was delivered to Mr. Gaffney. Instead, Mr. Gourguechon testified that he typed that letter and chose its words, including reference to the phrase "unauthorized communication and correspondence with regulatory bodies having jurisdiction over the operation of the vessel." Tr.IV at 113. Moreover, Mr. Gourguechon admitted at trial that he made the ultimate decision to terminate the plaintiffs:

> Q: You made the decision to terminate Mike Gaffney, and only after you made that decision you went to Captain Heitmeier and told him that and he just said okay, go ahead.
>
> A: Yes, that could be correct.
>
> Q: So you did make the decision to terminate Mike Gaffney?
>
> A: Yes.

*Id.* at 76-77.

Additionally, there is no evidence that Mr. Heitmeier knew of the plaintiffs' letters to the Coast Guard until the

complaint was served on the *M/V Showboat* on January 14, 1998; by that date, Mr. Gaffney, as well as four other plaintiffs, had been fired in retaliation for their protected communications with the Coast Guard. Absent proof that Mr. Heitmeier knew of the plaintiffs' reports of a safety violation on board the *M/V Showboat* prior to the drafting of Mr. Gaffney's termination letter, and, indeed, prior to the termination of five of the ten plaintiffs, there is no support, direct or circumstantial, for the conclusion that Mr. Heitmeier was motivated by this communication in ordering the plaintiffs' terminations.

### E. Damages

#### 1. Availability of Compensatory and Punitive Damages

The parties dispute whether the district court erred in awarding the plaintiffs punitive damages, as well as in awarding the plaintiffs expenses incurred in the course of obtaining new employment. Before we address the merits of these issues, we pause to consider whether Riverboat waived the argument that § 2114 permits only equitable relief—limited to reinstatement with back pay—by failing to raise it in a timely fashion. Specifically, Riverboat neglected to make this argument in its post-trial brief; it instead responded for the first time to the plaintiffs' request for compensatory and punitive damages in its Rule 52 Motion for Judgment or, in the Alternative, for Amendment of Judgment Pursuant to Rule 59.

Ordinarily, a challenge to damages not raised until post-judgment motions is deemed waived. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000); *see also Ameritech Info. Sys., Inc. v. Bar Code Res., Inc.*, 331 F.3d 571,

574 (7th Cir. 2003).[31] However, this general waiver principle does not resolve, by itself, the situation before us. Given the very unique procedural history of this case, we must examine and evaluate the record as a totality to determine whether the defendants waived this issue. The plaintiffs first contend that Riverboat should have objected to their request for punitive damages in their proposed jury instructions and that the failure to do so constitutes waiver. However, Riverboat *did* file objections to the plaintiffs' jury instructions, including to the plaintiffs' request for an instruction on punitive damages. *See* R.160 at 6 (objecting to the proposed instruction on damages as "placing undue emphasis on an award of damages, and incorrectly allowing punitive damages and other compensatory damages for violations of general maritime law and statutory violations. Defendants suggest that no instruction be given"). That Riverboat did not further develop this objection is, in all likelihood, attributable to the procedural development of the case. The trial was not sent to a jury but instead was heard by the magistrate judge. Notably, the district court was given a full opportunity to address the merits of Riverboat's position on the availability of compensatory and punitive damages during post-trial proceedings, and the district court, who

---

[31] *Cf. Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (holding that the defendants waived their objection to the imposition of statutory penalties on the basis of contributory infringement by (a) not raising the objection in their proposed findings of fact and conclusions of law post-trial; and (b) "calculat[ing] statutory damages on the basis of [contributory] infringement[]" in this same filing). Unlike the party in *Los Angeles News*, however, there is no indication that Riverboat assumed the availability of punitive damages in the course of calculating its proposed damages.

obviously was far more knowledgeable about the course of proceedings than the cold record allows us to be, considered the possibility of waiver but nevertheless decided to proceed to the merits of the issue. The plaintiffs certainly were given a "meaningful opportunity to respond" to the defendants' challenges in their responses to the defendants' post-trial motions. *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004). Similarly, the district court was given ample opportunity to address the issue. In light of these circumstances, we cannot say that the district court erred in determining that the availability of damages had been preserved adequately.

Therefore, we turn to the merits of Riverboat's challenge to the availability of compensatory and punitive damages. The district court examined the text of 46 U.S.C. § 2114, as well as general maritime law and analogous retaliatory discharge case law, and concluded from these sources that compensatory and punitive damages were available in this case. *See* R.191 at 36-40 (also noting that punitive damages would further the purpose of § 2114 in light of the potential chilling effect that flows from workplace retaliation). As a question of law, we review this conclusion de novo. *Kramer v. Banc of America Sec., LLC*, 355 F.3d 961, 964 (7th Cir. 2004) (reviewing the district court's conclusion that punitive damages were permissible under the governing statute de novo).

At the time of the events in this case, 46 U.S.C. § 2114 provided that, if a seaman is terminated in retaliation for protected correspondence with the Coast Guard, he is entitled to "any appropriate relief, including—(1) restraining violations of this section; and (2) reinstatement to the seaman's former position with back pay." § 13(b), 98 Stat. at 2864. Riverboat contends that the statute does not make

available either compensatory or punitive damages, but rather "limits the plaintiff's [sic] relief to equitable remedies such as reinstatement and back pay." Appellants' Br. at 43.

The plain text of the statute, however, makes clear that the plaintiffs' relief is not so limited. The statute authorizes a federal court to award any and all relief that the court deems appropriate. Equitable remedies, including an injunction and reinstatement, are listed in a demonstrative fashion; such remedies may be awarded, but do not represent the exclusive options available to the court.[32] This conclusion is bolstered by § 2114's legislative history. First, the legislative history describes § 2114 as making available a "legal remedy," *see* S. Rep. No. 98-454, at 12 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4831, 4842, a term of art that—as a historical matter—encompasses and is defined by monetary relief. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) ("Legal remedies traditionally involve money damages."). Second, Congress noted in the legislative history that § 2114 is intended to create a "private right of action similar . . . to that in OSH Act section 11(c)." S. Rep. No. 98-454. Indeed, Congress employed precisely the same statutory language in § 2114 as it did in OSHA, in both cases making available all "appropriate relief*." Compare* § 13(b), 98 Stat. at 2864, *with* 29 U.S.C. § 660(c)(2). This provision in the OSHA statute has been held to authorize both compensatory and punitive damages. *See Reich v. Cambridgeport Air Sys., Inc.*, 26

---

[32] *See also Brown v. Sea-Land Serv., Inc.*, 1992 WL 161045, at *2 (9th Cir. 1992) (holding that it is within the court's discretion to award both reinstatement and punitive damages for violation of § 2114, although finding that the district court's decision not to award such remedies did not constitute an abuse of discretion).

F.3d 1187, 1191-92 (1st Cir. 1994). Specifically, the First Circuit in *Reich* deemed Congress' choice of words, in light of governing Supreme Court precedent, significant. It pointed out that, in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992), the Supreme Court held that, as a general matter and "absent clear direction to the contrary by Congress, the federal courts have the power to award *any appropriate relief* in a cognizable cause of action brought pursuant to a federal statute," including compensatory and punitive damages. *Id.* at 70-71 (emphasis added). In turn, when a statute explicitly makes available "any appropriate relief," referencing the broad power of the federal courts to award both compensatory and punitive damages, we can infer that Congress intended prevailing plaintiffs to recover compensatory and punitive remedies. This is true of § 2114, as it is of OSHA § 11(c).[33]

Riverboat, however, submits that by detailing available forms of relief that are equitable in nature—an injunction, reinstatement and back pay—Congress thereby limited the available remedies to those listed in the statute. We cannot accept this argument. Use of the term "including," followed by a list of equitable remedies, "indicates the availability of the named remedies, but does not purport to limit 'all appropriate relief' to those remedies only." *Reich*, 26 F.3d at 1191; *see also Black's Law Dictionary* 687 (5th ed. 1979) (" 'Including' within a statute is interpreted as a word of . . . illustrative application"). By choosing to begin with the

---

[33] *See Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1191 (1st Cir. 1994) ("[A]ll appropriate relief as written in [OSHA] § 11(c) embraces monetary damages as well as other relevant forms of relief normally available, Congress having provided no clear direction to the contrary." (internal quotation marks omitted)).

phrase "any appropriate relief"—rather than merely providing that a seaman is entitled to an award "restraining violations of this section; [and] reinstatement to the seaman's former position with backpay," § 13(b), 98 Stat. at 2864—Congress made it clear that it was not presenting an exhaustive list of available remedies.[34] Thus, we read "any

---

[34] Riverboat relies upon two cases for the proposition that "including" serves a limiting function in § 2114, both of which are inapposite. In *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961 (7th Cir. 2004), we addressed a claim of retaliation under the Americans with Disabilities Act ("ADA"). The remedies available under the ADA are those provided by the 1964 Civil Rights Act; that statute makes available "such affirmative action as may be appropriate," including an injunction, reinstatement, back pay or "any other *equitable relief* as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1) (emphasis added). Unlike § 2114, which authorizes "any" appropriate relief, *see* § 13(b), 98 Stat. at 2864, the ADA explicitly restricts the relief available to a prevailing party. Not only does the statute suggest that "affirmative action" consists only of "*equitable* relief," 42 U.S.C. § 2000e-5(g)(1) (emphasis added), but "affirmative action" is an equitable term of art. *See Black's Law Dictionary* 55 (5th ed. 1979) (defining "affirmative action" as action to "make effective the redress of rights").

Riverboat also finds support in *Espinueva v. Garrett*, 895 F.2d 1164 (7th Cir. 1990). There, the plaintiff sought compensatory and punitive damages under both Title VII and the Age Discrimination in Employment Act ("ADEA"). The court held that neither statute authorizes an award of compensatory or punitive damages. *Id.* at 1165. *Espinueva* is also inapposite. First, the remedy for violation of Title VII, like for violation of the ADA, is provided by the 1964 Civil Rights Act. That Act, unlike § 2114, limits available relief to "affirmative action" and other

(continued...)

appropriate relief" as an umbrella label; in turn, the phrase "including restraining violations . . . and reinstatement" indicates that the umbrella of available remedies encompasses both legal and equitable relief.

## 2. Calculation of Back Pay Awards

Riverboat also submits that, although the statute explicitly authorizes the district court to award the plaintiffs back pay for lost income, the district court erred in its calculations. Specifically, Riverboat contends that the plaintiffs did not mitigate their damages by immediately seeking re-employment, but instead spent significant amounts of time walking the picket line, taking various classes and traveling after being terminated by Riverboat. Riverboat also submits that the district court failed to calculate carefully the income earned by each plaintiff post-termination.

### a. mitigation

The plaintiffs were required to mitigate their damages by using reasonable diligence in seeking employment after their terminations. However, because the lack of mitigation is an affirmative defense, the burden of proof for this issue falls on the employer. *See Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) (discussing mitigation

---

[34] (...continued)
"equitable relief." 42 U.S.C. § 2000e-5(g)(1). Moreover, since the ADEA "adopts the enforcement scheme used in Title VII cases brought by federal employees," *Smith v. Office of Personnel Mgmt.*, 778 F.2d 258, 262 (5th Cir. 1985), the same analysis limits the remedies available for violation of the ADEA.

rules applicable to the calculation of damages under Title VII). The district court found that Riverboat had failed to meet this burden. After four days of testimony at trial detailing with particularity the plaintiffs' post-termination activities, including the specifics of their job search efforts, the district court decided that the plaintiffs had made reasonable efforts to find new employment. The court recognized that various plaintiffs walked the picket line in front of the *M/V Showboat*, R.191 at 30-33, and that some plaintiffs took time off after being terminated to attend various classes, *id.* at 31-32. However, it concluded that the defendants had not proven that the plaintiffs failed to mitigate their damages; instead, the evidence showed that "the plaintiffs walked the picket line for negligible amounts of time," and were "actively seeking employment during that time." *Id.* at 35. We are bound by these findings unless they are clearly erroneous. *See Wichmann v. Bd. of Trs. of S. Illinois Univ.*, 180 F.3d 791, 805 (7th Cir. 1999).

The defendants have provided us very little reason to question the district court's findings. For example, Riverboat offers no evidence refuting the testimony that the union was actively looking for employment on behalf of some of the plaintiffs during the weeks and months after their terminations.[35] Nor does Riverboat challenge the district court's finding that the plaintiffs were able to "actively seek[] employment" while also walking the picket line, a finding that is aptly supported by the plaintiffs' testimony.[36] R.191

---

[35] *See, e.g.*, Goodridge Test., Tr.II at 22. *But see* Anderson Test., Tr.II at 162 (explaining that the MEBA was unable to find him a job).

[36] *See, e.g.*, Gaffney Test., Tr.I at 186 ("I updated my resume and
(continued...)

at 35. From this evidence, we conclude that the plaintiffs "demonstrat[ed] a continuing commitment to be a member of the work force" after being discharged by Riverboat. *Donnelly v. Yellow Freight Sys., Inc.*, 874 F.2d 402, 411 (7th Cir. 1989) (discussing Title VII mitigation requirements).

The same is true of the classes taken by three of the plaintiffs post-termination. Riverboat does not contest the district court's conclusion that compensation for the time spent engaging in alternative activities is appropriate, given that, had the plaintiffs not been discharged, they would have no need to engage in such activities. *Id.* at 34-35. Further, this conclusion is consistent with our case law. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 866 (7th Cir. 2003) (rejecting the argument that the plaintiff's back pay award should be reduced to take into account a term of voluntary educational leave and holding that, had the plaintiff been properly promoted, "she would not have taken the educational leave").

Additionally, even if the defendants' view of the evidence was a legitimate interpretation of the underlying events, we cannot conclude that the district court's finding—that the plaintiffs' efforts to find alternative work were reasonable—is clearly erroneous. *Cf. Kasper v. St. Mary of Nazareth Hosp.*, 135 F.3d 1170, 1176 (7th Cir. 1998) (holding that testimony concerning whether employee failed to mitigate

---

(...continued)
grabbed my phone book and starting sending out resumes and started looking for new work."); Anderson Test., Tr.II at 178 (explaining that, even on days when he walked the picket line, he also was actively searching for a job); Palmer Test., Tr.III at 90 (explaining that, after being terminated, he "made some phone calls" and "got a job").

damages is a question of credibility and deferring to jury's assessment of whether or not to believe him).

### b. calculation of lost wages

Riverboat also challenges the district court's calculation of the plaintiffs' lost earnings. As in other retaliatory discharge contexts, salary earned after a plaintiff is terminated should be deducted from the back pay otherwise allowable. *Cf. Donnelly*, 874 F.2d at 411 (discussing calculation of damages under Title VII). In this case, the district court detailed with precision the salaries earned by the plaintiffs after being discharged by Riverboat; the number of work days missed between their terminations and finding new employment; and the income earned, and hours worked, in their new positions in relation to their salaries and hours while employed by Riverboat. *See* R.191 at 30-36. "In reviewing the claim for 'loss of wages,' we note that we are bound by the district court's determination as to the appropriate amount of damages unless that determination is clearly erroneous." *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990).

To be sure, the testimony of some of the plaintiffs on this issue is slightly vague. For example, Mr. Palmer responded to a question about his income in 1998 with, "Maybe $30,000. I don't know." Tr.III at 91. He then estimated that his income for the next few years was "[p]robably somewhere in the same ball park." *Id.* Nevertheless, Riverboat has failed to offer any evidence that Mr. Palmer's estimate that he earned $30,000 per annum does not reflect accurately his actual income. In calculating lost income, the district court is free to credit the plaintiffs' testimony regarding their sources and level of income. In this respect, the record

supports the district court's conclusion that Mr. Palmer earned $30,000 a year in his new position, $20,020 less than his annual salary while employed by Riverboat.

### c.  reductions to back pay awards

The parties also dispute whether the district court erred in calculating the back pay to which Messrs. Goodridge, Gaffney and Beardon were entitled. Specifically, Riverboat submits that, because these plaintiffs held positions after being terminated that paid a higher salary than did their positions on board the *M/V Showboat*, their back pay entitlements should have been adjusted downward accordingly.

Riverboat's contention as it relates to Mr. Beardon is without merit. Although Mr. Beardon's annual salary in various positions post-termination was greater than his annual salary at Riverboat, the court properly discounted these earnings to take into account the number of hours worked. Mr. Beardon worked an eight-hour workday at Riverboat, but he worked a twelve-hour workday in both of his new, higher-paying positions. Had he only worked eight hours a day, he would have earned less than he did while employed by Riverboat, warranting back pay.

We next turn to Riverboat's claim concerning the calculation of Mr. Goodridge and Mr. Gaffney's earnings. In all but one of his positions after being terminated by Riverboat, Mr. Goodridge earned less than he would have earned had he remained on *the M/V Showboat*; the only exception is 34 days in 2002, during which he worked for MTL Lines on board a tanker. He was paid $325 per day for this 34-day period, which is $36 per day more than he made while employed by

Riverboat. Riverboat contends that the district court erred in failing to subtract this amount, which totals $1,224, from his back pay award. Similarly, Mr. Gaffney lost 14 days of wages looking for work, as well as suffered miscellaneous expenses related to his termination; but, after he obtained new employment, he earned more than he did while employed by Riverboat. Riverboat submits that Mr. Gaffney's higher salary should offset any losses he suffered while unemployed.

In the context of a retaliatory discharge claim under OSHA § 11(c)—a statute which we have already explained is analogous to § 2114, *see* S. Rep. No. 98-454, at 12 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4831, 4842—the court will award back pay to the plaintiffs "as compensation for income that would have accrued to them had they not been wrongfully dismissed." *Donovan v. Freeway Const. Co.*, 551 F. Supp. 869, 880 (D. R.I. 1982) (holding that the plaintiffs were entitled to the differential between their new and old wages); *see also Martin v. H.M.S. Direct Mail Serv., Inc.*, 936 F.2d 108, 109 (2d Cir. 1991) (holding that the plaintiff was entitled to back pay for the differential between unemployment compensation received and the salary he would have earned if not terminated). In other words, under OSHA, "[t]he award of back pay must be reduced by the amount of any income from employment earned by complainants during the period covered by the back pay award." *Donovan*, 551 F. Supp. at 880; *see also Martin*, 936 F.2d at 109 (subtracting from the back pay award unemployment compensation received). This same rule applies in the analogous context of Title VII. *See, e.g.*, *Chesser v. Illinois*, 895 F.2d 330, 338 (7th Cir. 1990).

The district court, in calculating back pay entitlements, implicitly[37] made a factual determination that the period during which Mr. Goodridge was eligible for back pay—and thus the period in which his earnings should be subtracted from his back pay award—terminated when his employment with MTL Lines began; it therefore awarded back pay for losses suffered up until mid-2002, when Mr. Goodridge took this position. As for Mr. Gaffney, the district court held that the 14-day period between termination and obtaining new employment was the period in which he was entitled to back pay and calculated equitable relief accordingly. These factual conclusions shall be reversed only if clearly erroneous. *See Matthews v. A-1, Inc.*, 748 F.2d 975, 978-79 (5th Cir. 1984) (reviewing the district court's "refus[al] to deduct [the plaintiff's] earnings at a higher paying position from her damage award" for clear error).

The district court's conclusions are not clearly erroneous, but rather are consistent with the calculation of the period in which a plaintiff is entitled to back pay in a variety of analogous contexts. For example, in the context of Title VII, a plaintiff is eligible for back pay from the date of her injury to the date that she acquires a higher-paying job. *See id.* at 978. The same is true in the context of both OSHA § 11(c), *see Donovan v. George Lai Contracting, Ltd.*, 629 F. Supp. 121, 122-23 (W.D. Mo. 1985) (awarding back pay for the period between termination and obtaining new employment), and

---

[37] The district court did not set forth specifically the period of back pay applicable to each plaintiff. Instead, the court merely agreed with the plaintiffs' back pay calculations and noted that these calculations "have not been challenged by the defendants." R.191 at 36. The final calculations, however, reflect the conclusions discussed in the text.

the ADEA, *see Stephens v. C.I.T. Group/Equip. Fin., Inc.*, 955 F.2d 1023, 1029 (5th Cir. 1992); *Kolb v. Goldring, Inc.*, 694 F.2d 869, 874 (1st Cir. 1982).

Therefore, although Mr. Goodridge and Mr. Gaffney are not entitled to back pay for any period in which they earned the same or more than they would have earned at Riverboat, their " 'excess' earnings are not to be subtracted from the back-pay award for the period of unemployment." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999) (discussing back pay for violation of the ADEA). Indeed, Riverboat has referred us to no case in which the plaintiffs' excess income—earned after the period of time covered by the back pay award—was subtracted from losses suffered during the applicable period of either unemployment or underemployment. In this light, we conclude that the district court did not err in refusing to subtract from their back pay awards Mr. Goodridge's earnings for the 34 days in which he was employed by MTL Lines and Mr. Gaffney's earnings after he obtained new employment.

### 3. Calculation of Punitive Damages

The district court, after concluding that the defendants acted willfully and wantonly in discharging the plaintiffs, *see* R.191 at 40, awarded each of the eight prevailing plaintiffs $25,000 in punitive damages. Riverboat submits that the district court erred in two respects. First, Riverboat challenges the district court's factual finding that the defendants acted willfully and wantonly in discharging the plaintiffs. According to Riverboat, Mr. Heitmeier did not know about the letters to the Coast Guard and thus did not willfully violate § 2114. Similarly, Mr. Gourguechon viewed the report as a job preservation effort, and instead terminated

the plaintiffs because of their pro-union activity. We review the district court's conclusions, which present questions of fact regarding the defendants' state of mind, for clear error. *NRC Corp. v. Amoco Oil Co.*, 205 F.3d 1007, 1014 (7th Cir. 2000).

As discussed above, Mr. Heitmeier is not liable in his individual capacity for violation of § 2114, and, thus, punitive damages with respect to his conduct are inappropriate. The district court, however, did make specific factual findings that Mr. Gourguechon's conduct warranted punitive relief and those findings are entitled to deference in this court. For example, the court found that, after being told by Mr. Gaffney that he could not fire someone for corresponding with the Coast Guard, Mr. Gourguechon did not "reconsider[] his decision or tak[e] the time to obtain legal advice," but instead "quickly fired the remaining plaintiffs." R.191 at 40. It also found that the fact that Mr. Gourguechon "remove[d] the offending language from the subsequent termination notices" supports the conclusion that he "believed that there was something seriously wrong in terminating [Mr.] Gaffney and the other plaintiffs." *Id.*

The district court's award of punitive damages is not against the weight of the evidence. While there is some contrary evidence in the record—for example, Mr. Gourguechon's willingness to provide various plaintiffs with a letter of recommendation after their terminations—the district court's rationale for awarding punitive damages is aptly supported by the facts of the case. Mr. Gourguechon was aware, as of January 6, 1998, that terminating the plaintiffs in retaliation for communicating with the Coast Guard was unlawful; nevertheless, within the next two weeks, he made the decision to terminate seven other signatories to the October 10th report. In light of this

conduct, and in light of other, related justifications for awarding punitive relief in this case, such as the possibility that the "defendants' actions . . . may have a chilling effect on the willingness of other seamen to report a violation," *id.*, we find that the district court did not err in awarding the plaintiffs punitive damages.

Riverboat also submits that, even if the statute authorizes punitive damages, they were not appropriately calculated in this case. Specifically, it contends that the $25,000 awards are excessive, given that the plaintiffs "suffered no long lasting effects of the termination." Appellants' Br. at 48 (internal quotation marks omitted).

A district court's calculation of punitive damage awards is reviewed for abuse of discretion if no constitutional violation is alleged.[38] *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433 (2001). We shall "set aside such an award only if it exceeds an amount necessary to serve the objective of deterrence and punishment." *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 581 (7th Cir. 1996) (internal quotation marks omitted).

---

[38] While Riverboat cites *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), for the proposition that the punitive damages awarded were excessive, both cases are inapplicable. *Gore* and *Campbell* addressed the claim that the punitive damages awarded by a jury were unconstitutionally excessive, in violation of the Due Process Clause of the Four-teenth Amendment. Riverboat has not asserted that the puni-tive damages calculations in this case were so arbitrary as to violate the Constitution of the United States. Therefore, we review the award only for abuse of discretion.

We cannot conclude on the basis of this record that the district court abused its discretion in awarding each prevailing plaintiff $25,000 in punitive damages. The district court carefully considered and balanced the competing factors: On the one hand, it noted that the plaintiffs' request for treble damages was "disproportionate to the type of harm suffered here and would result in a windfall for the plaintiffs." R.191 at 40-41. Nevertheless, the court held, the need to "vindicate [the plaintiffs'] rights" made some measure of punitive relief appropriate. *Id.* at 41. As required by our case law, the court also carefully considered the amount "necessary to serve the objective of deterrence and punishment." *Merriweather*, 103 F.3d at 581. The purpose of punitive relief in the case, the court found, would be to punish the defendants' willful and wanton conduct and to deter others from engaging in similar illegal conduct. This goal is particularly significant in the context of a retaliatory discharge claim, as here, given that the outcome of the case "may have a chilling effect on the willingness of other seamen to report a violation." R.191 at 40. On this basis, the court deemed $25,000 per plaintiff in punitive damages appropriate.

In light of these considerations, the punitive damages awards are within the bounds of reason.[39] *See Merriweather*, 103 F.3d at 582 (upholding the district court's award of punitive damages in similar circumstances). Indeed, this

---

[39] In light of the broader goals served by the awards of punitive damages in this case, we also cannot accept Riverboat's argument that the district court abused its discretion in awarding the plaintiffs equal sums. Although certain plaintiffs suffered little to no actual harm from their terminations, "each plaintiff suffered the same deprivation of a statutory right," rendering appropriate "[a]n equal amount for each plaintiff." R.191 at 41.

sum is less than the actual damages suffered by most of the plaintiffs, which in all but two circumstances exceed $25,000. We therefore uphold the plaintiffs' award as calculated by the district court.

### 4.  Set-Off

Riverboat submits that the district court also erred in refusing to set-off the total damage award with the amount received by the plaintiffs in settlement with the Showboat defendants. The plaintiffs respond that, pursuant to the district court's denial of the plaintiffs' motion in limine, Riverboat was permitted to introduce this evidence at trial, but failed to do so; therefore, they have waived the opportunity to object to the calculation of damages on this basis.

In certain contexts, when multiple defendants cause a single injury to the plaintiff, a defendant held liable at trial may be entitled to have the damages assessed reduced by the amount paid in settlement to the plaintiff by a joint tortfeasor. We need not reach the applicability of this rule today. The plaintiffs filed a pre-trial motion in limine, requesting that the district court preclude the introduction of the plaintiffs' loan receipt agreement with Showboat, which they feared would be used to offset their damages. *See* R.150. At the beginning of the trial, the district court ruled on all pre-trial evidentiary motions. It held, however, that it was unnecessary to decide at that stage of the proceedings whether to grant or deny the motion in limine to preclude admission of evidence on the existence of a loan agreement with Showboat:

> The motion in limine to preclude evidence of the loan agreement, those types of matters go to the measure of damages. Had this been a jury trial, that is something

that would have been discussed in any post trial proceedings if the jury had returned a verdict in favor of the plaintiffs. As the trial proceeds, since this is a bench trial, we can worry about that, since that is an issue of damages and the measure of damages, assuming that the plaintiffs prevail.

Tr.I at 5.

As evidenced by this passage, the district court invited Riverboat to renew its arguments at a later time—presumably in the course of seeking admission of evidence substantiating the terms of the plaintiffs' settlement agreement with Showboat. Riverboat failed to take advantage of this opportunity; it neither moved for admission of documents evidencing the settlement agreement nor discussed the settlement as a mitigating factor at trial. As a result, the record contains no evidence upon which we can conclude that the district court erred in failing to take into account the plaintiffs' settlement with Showboat.

### F. Attorneys' Fees

In the plaintiffs' cross-appeal, they submit that the district court erred in refusing to award them reasonable attorneys' fees. They contend that the remedial language of the statute—which makes available "any appropriate relief"—is sufficiently broad as to authorize a federal court to award attorneys' fees under appropriate circumstances. § 13(b), 98 Stat. at 2864. The district court, however, held that absent express statutory authorization to the contrary, a party generally is responsible for their own cost of representation. *See* R.191 at 42. The court explained that, at the time of the events in this case, 46 U.S.C. § 2114 did not contain such authorization and that "[a]llowing the plaintiffs to recover

attorney [sic] fees would be similar to allowing them to recover double the punitive damages amount." *Id.* at 42-43.

We follow the "American Rule" with respect to attorneys' fees, which requires "express" statutory authorization of such fees. *Zeigler Coal Co. v. Dir., Office of Workers' Comp. Programs*, 326 F.3d 894, 899 (7th Cir. 2003). "A federal court normally will not order one party in a case to pay another party's attorneys' fees unless Congress has authorized such fee awards by statute." *King v. Illinois State Bd. of Elections*, 410 F.3d 404, 412 (7th Cir. 2005). At the time of the events in this case, Congress had not yet provided for fee-shifting in § 2114.[40] The plaintiffs, however, respond that the statute makes available all "appropriate relief," which includes in its scope attorneys' fees. This interpretation is inconsistent with our case law, as well as the general American Rule.

The plaintiffs also submit that *Hall v. Cole*, 412 U.S. 1, 5 (1973), and *Kinslow v. American Postal Workers Union, Chicago Local*, 222 F.3d 269, 279-80 (7th Cir. 2000), provide additional justification for reversing the district court's denial of attorneys' fees. First, they contend that they are entitled to attorneys' fees under the "common benefit" doctrine. This doctrine is an equitable, judicially created exception to the American Rule, which flows from the "common fund" exception.[41] It provides that, although in the absence of a

---

[40] Section 2114 subsequently was amended to make available "an award of costs and reasonable attorney's fees to a prevailing plaintiff not exceeding $1,000." 46 U.S.C. § 2114(b)(3). Neither party argues that the amended provision, which was passed after the litigation in the district court commenced, directly affects the calculation of fees in this case.

[41] *Hall v. Cole*, 412 U.S. 1, 4-5 (1973) ("[F]ederal courts, in the
(continued...)

fee-shifting statute plaintiffs are generally not entitled to fees, when a plaintiff's "successful litigation confers a substantial benefit on the members of an ascertainable class," the court may award attorneys' fees. *Hall*, 412 U.S. at 5 (internal quotation marks omitted). This benefit need not be pecuniary; however, the court's jurisdiction over the subject matter must "make[] possible an award that will operate to spread the costs proportionately among [the persons benefitting from the court's ruling]." *Id.* The underlying theory is that to "allow [these individuals] to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich [them] unjustly at the plaintiff's expense." *Id.* at 6.

The common benefit exception is inapplicable to this case. The plaintiffs ask this court to shift their fees to the defendants; the common benefit doctrine, however, serves to shift fees and expenses from the plaintiffs individually to the benefitting class as a whole. To award attorneys' fees under this theory "is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefitted from them." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396-97 (1970); *see also id.* at 397 (reimbursing the plaintiffs for attorneys' fees from the corporate treasury, thus spreading the costs across the benefitting shareholders); *Hall*, 412 U.S. at 8-9 (holding that the plaintiffs acted on behalf of all union members, and reimbursing the attorneys' fees from the union treasury, such that all union members in effect equally contributed to the costs of litigation). Moreover, the

---

[41] (...continued)
exercise of their equitable powers, may award attorneys' fees when the interests of justice so require."); *see also id.* at 5 n.7 (tracing the doctrine's origins to the "common fund" theory).

plaintiffs have not met their burden of proof on this issue: Not only have they failed to identify a readily ascertainable group of persons benefitting from their successful litigation, but they also have failed to suggest a workable strategy for distributing the costs of representation among such persons. *See Brzonkala v. Morrison*, 272 F.3d 688, 692 (4th Cir. 2001) (rejecting the applicability of the common benefit doctrine, given that the plaintiffs did not identify a strategy for "shift[ing] costs with some exactitude to those benefitting" (internal quotation marks omitted)).

Second, the plaintiffs urge us to find attorneys' fees appropriate because the defendants "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall*, 412 U.S. at 5 (internal quotation marks omitted). However, the "bad faith" requirement has been interpreted strictly by this court. *See Satoskar v. Indiana Real Estate Comm'n*, 517 F.2d 696, 698 (7th Cir. 1975) ("The standards for bad faith are necessarily stringent."); *see also Singer Co. v. Skil Corp.*, 803 F.2d 336, 341 (7th Cir. 1986) (holding the bad faith rationale inapplicable, given that the defendants acted in good faith in appealing the case and in raising defenses to the plaintiffs' claims). We find no need to liberalize the rule in this case. The district court made conclusive factual findings that the defendants did not "behave[] vexatiously during the course of litigation." R.191 at 43. These findings are binding upon us in the absence of clear error. Given the absence of any evidence that Riverboat did not raise its defenses to the plaintiffs' claims in good faith, and given the plaintiffs' failure to point us to any particularly egregious conduct on Riverboat's part in the course of this litigation, we uphold these findings and, consequently, affirm the district court's denial of attorneys' fees.

## G. Riverboat's Counterclaim

On November 16, 2000, the district court granted summary judgment in favor of Showboat on Riverboat's counterclaim. *See* R.99. It held that the Agreement between Showboat and Riverboat does not obligate Showboat to obtain a general "acts and omissions" policy.[42] *Id.* at 7. "[W]hereas section 5.01.1 spells out Showboat's duty to obtain insurance policies for 'acts, omissions and injuries,'" the court explained, "subsection 5.01.01 (a subsection of 5.01.1) articulates the types of coverages to be included within those policies." *Id.* at 6. Therefore, according to the district court, Showboat is not required to insure against Riverboat's violation of federal employment laws, including 46 U.S.C. § 2114, and accordingly, is not required to indem-

---

[42] The indemnification provisions of the Agreement provide:

5.01.1 Owner shall obtain insurance, including Jones Act coverage, the minimum amount of not less than Five Million Dollars ($5,000,000), for the acts, omissions and injuries to persons or property caused in whole or in part by the Maritime Staff and/or Manager, its agents or employees. . . .

5.01.01.1 Owner shall procure at its own cost and expense, including the cost of all deductibles, and continuously maintain in force the following insurance coverages:

(a) Worker's Compensation Insurance . . . ;

(b) Comprehensive General Liability Insurance . . . ;

(c) Full form Protection and Indemnity Insurance on all vessels and floating equipment . . . ;

(d) Hull and Machinery Insurance . . . ;

(e) Collision and Liability Insurance for damage to vessels . . . .

R.37, Ex.A §§ 5.01.1; 5.01.01.1.

nify Riverboat against losses stemming from Showboat's failure to provide this insurance coverage.

Riverboat appeals this decision. It argues that the district court erred in finding that the Agreement unambiguously requires Riverboat to bear its own expenses in this context, given various inconsistencies among the Agreement's provisions. For example, insurance for liabilities arising under the Jones Act—which the district court held was one of the six required areas of coverage—is listed in the general, introductory paragraph in section 5.01.1, rather than in section 5.01.01.1, the subsection that allegedly enumerates and thereby limits Showboat's obligations. *See* R.37, Ex.A. Second, section 5.01.1 requires a policy with a $5,000,000 minimum; however, the minimum policy limits for the five types of coverages listed in section 5.01.01.1 range from $2,000,000 to $5,000,000 and total $14,000,000.[43] Third, section 5.01.1, in mandating that Riverboat be named as the insured party, uses the phrase "the foregoing policies." *Id.* § 5.01.1. In so doing, the Agreement's language clearly indicates that the immediately proceeding provision requiring insurance for "acts, omissions and injuries" is intended as a free-standing insurance and indemnification clause. *Id.* In light of these inconsistences, according to Riverboat, the only logical interpretation of section 5 of the Agreement is that the parties intended Showboat to obtain

---

[43] The Agreement requires the purchase of $2,000,000 in Comprehensive General Liability Insurance (accident); $2,000,000 in Comprehensive General Liability Insurance (property damage); $5,000,000 in Full Form Protection and Indemnity Insurance on all vessels and floating equipment; and $5,000,000 Collision Liability Insurance. The other coverages listed in sections 5.01.1 and 5.01.01.1 do not specify their minimum limits.

a separate, independent insurance policy for general acts and omissions, with a minimum policy coverage of $5,000,000.

Showboat responds that the Agreement unambiguously limits its insurance obligation to the six types of coverage enumerated in sections 5.01.1 and 5.01.01.1. While section 5.01.1 does mention insurance for Riverboat's "acts, omissions and injuries," it also qualifies this broad language by limiting Showboat's employment-related liabilities to violation of the Jones Act. By contrast, all policies listed in section 5.01.01.1 pertain to property damage and third party liabilities, and logically cannot be read to include insurance for violation of 46 U.S.C. § 2114. Moreover, Showboat maintains that requiring it to insure Riverboat against a retaliatory discharge claim would contravene the underlying purpose of the Agreement: The Agreement obligates Riverboat to operate the vessel, including the hiring, firing and management of its crew, in compliance with applicable federal law and Coast Guard regulations. To indemnify Riverboat for flouting its obligations under the Agreement by firing the plaintiffs in violation of 46 U.S.C. § 2114 would thwart the Agreement's fundamental goal.

"Indemnity agreements are contracts subject to the rules and principles of contract construction." *TLB Plastics Corp. v. Procter & Gamble Paper Prods. Co.*, 542 N.E.2d 1373, 1377 (Ind. App. 1989). Therefore, whether Showboat is required to insure against, and now must indemnify, retaliatory discharge claims under 46 U.S.C. § 2114 is governed by state law principles of contract formation and interpretation. The parties appear to agree that Indiana law applies in this case. Our review of the district court's interpretation of this law is plenary. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 239

(1991) ("[C]ourts of appeals review the state-law determinations of district courts *de novo*.").

As a general matter, parties are free under Indiana law to enter into an indemnification clause and may obligate one party to insure against and/or to indemnify certain acts or omissions of the other party. *Moore Heating & Plumbing, Inc. v. Huber, Hunt & Nichols*, 583 N.E.2d 142, 145 (Ind. App. 1991). However, it must be clear from the contract or surrounding circumstances that the burdened party agreed "knowingly and willingly" to insure against or indemnify the acts or omissions in question. *Id.*; *see also Weaver v. American Oil Co.*, 276 N.E.2d 144, 148 (Ind. 1971) ("We do not mean to say or infer that parties may not make contracts . . . providing for indemnification, but it must be done knowingly and willingly as in insurance contracts made for that very purpose."). To ensure that a party is not saddled with an unintended burden to insure or indemnify, such provisions are "strictly construed . . . and will not be held to provide indemnity unless so expressed in clear and unequivocal terms." *Moore Heating*, 583 N.E.2d at 145 ("Courts disfavor such indemnification clauses because to obligate one party to pay for the negligence of the other party is a harsh burden which a party would not lightly accept."); *see also Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 480 (Ind. App. 2000) (holding that, because the indemnification clause "contain[ed] no clear statement that would give the contractors notice of the harsh burden that complete indemnification imposes," indemnification was inappropriate); *Ogilvie v. Steele by Steele*, 452 N.E.2d 167, 170 (Ind. App. 1983) (holding that "[an indemnification] clause must expressly state, in clear and unequivocal terms, that the indemnitor agrees to indemnify the indemnitee against the indemnitee's own negligence" (internal quotation marks omitted)).

The Agreement in this case does not "clear[ly] and unequivocal[ly]," *Ogilvie,* 452 N.E.2d at 170, require Showboat to obtain an insurance policy that covers the intentional violation of retaliatory discharge laws. To be sure, section 5.01.1 does speak generally of insurance coverage for "acts, omissions and injuries to persons or property" caused by Riverboat. R.37, Ex.A § 5.01.1. However, in light of the strict construction given indemnification agreements under Indiana law, we cannot conclude that the Agreement mandates insurance coverage or indemnification in this case. The Agreement does not require, much less mention, insurance for retaliatory discharge claims, or even the general violation of state or federal employment laws. It is true that the term "including" in section 5.01.1 may suggest a broad reading of Showboat's insurance obligations—one that may encompass, but is not limited to, Jones Act coverage. But that interpretation is by no means compelled by the contractual language.[44] Another reasonable interpretation is

---

[44] For this reason, this case is easily differentiated from the Indiana state law cases cited above. *See, e.g., Ogilvie v. Steele by Steele*, 452 N.E.2d 167, 170-71 (Ind. App. 1983) (holding that the indemnification contract between an owner of train tracks and an owner and operator of a train "clearly and unequivocally" required indemnification for the track owner's negligence, given that the contract explicitly stated that the indemnification provisions "shall apply regardless of considerations of fault or negligence"); *see also Avant v. Cmty. Hosp.*, 826 N.E.2d 7, 11 (Ind. App. 2005) (holding that an indemnification clause that covers "all claims, demands, rights and causes of action of any kind, whether arising from [Avant's] own acts or those of Fitness Pointe," encompassed indemnification for negligent implementation of a fitness program). Unlike these contracts, the Agreement between Showboat and Riverboat does not specifically require

(continued...)

the one adopted by the district court: that section 5.01.1 serves as an introductory paragraph, which sets forth Showboat's general obligation to obtain insurance coverage, and that its subsection, section 5.01.01.1, limits this obligation by specifying the scope of the requisite coverage. In light of these two conflicting but equally plausible interpretations, we cannot say that the Agreement, in "clear and unequivocal terms," *Moore Heating*, 583 N.E.2d at 145, provided Showboat "notice of the harsh burden that complete indemnification imposes," *Exide*, 727 N.E.2d at 480.

Two other reasons compel us to uphold the district court's grant of summary judgment in favor of Showboat. First, under Riverboat's interpretation, Showboat would be saddled with a practically limitless obligation to insure Riverboat against liability for *all* conceivable legal wrongs, up to a $5,000,000 policy limit. Yet, Riverboat has offered no evidence that the parties intended this result when contracting for insurance coverage. Second, even if the Agreement were unambiguously to mandate that Showboat obtain insurance coverage above and beyond the six categories of insurance enumerated in sections 5.01.1 and 5.01.01.1, the Agreement nevertheless cannot be read to require insurance coverage or indemnification in this case. The Riverboat defendants acted willfully and wantonly in terminating the plaintiffs, in violation of the plaintiffs' rights under § 2114. Indiana courts "have clearly and repeatedly affirmed the general proposition that public policy prohibits the use of insurance to provide indemnification for civil tort liability that results from an insured's intentional wrongdoing." *Sans*

---

(...continued)
Showboat to insure against the general violation of federal law, including violation of retaliatory discharge statutes.

*v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1102 (Ind. App. 1997) (quoting R.E. Keeton & A.I. Widiss, *Insurance Law* 518-19 (1988)). Indeed, to require Showboat to indemnify Riverboat in these circumstances would be contrary to the purpose of the Agreement's other provisions, which place on Riverboat an obligation to ensure the vessel's compliance with state and federal law and regulations. *See also Riffle v. Knecht Excavating, Inc.*, 647 N.E.2d 334, 339 (Ind. App. 1995) (noting the obligation to read the contract as a whole, so as to give meaning to all of its provisions). Therefore, we affirm the district court's order granting summary judgment to Showboat on Riverboat's counterclaim.

## Conclusion

For the foregoing reasons, we affirm the district court's judgment that the plaintiffs were discharged in retaliation for correspondence protected under 46 U.S.C. § 2114 and its calculation of the plaintiffs' remedies. We also affirm the district court's judgment that Showboat is not contractually obligated to indemnify Riverboat for its losses. We reverse the judgment of the district court as it relates to the finding of liability against Mr. Heitmeier, holding that there is no evidence substantiating his role in terminating the plaintiffs in retaliation for their correspondence with the Coast Guard. Additionally, we hold that the district court erred in finding that Mr. Doncet and Mr. Horton are not entitled to whistleblower protection under § 2114 and remand for further proceedings consistent with this opinion.

AFFIRMED in part and REVERSED and
REMANDED in part

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*